**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERVARSITY CHRISTIAN FELLOWSHIP/ USA, et al.,<br>*Plaintiffs*,<br>v.<br>SUNY BROOME COMMUNITY COLLEGE, et al.,<br>*Defendants*. | Case No. 3:26-cv-01623-MAD-MJK<br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

LEGAL STANDARD ........ 9

ARGUMENT ........ 9

I. Plaintiffs are likely to succeed on the merits. ........ 9

A. SUNY Broome's exclusion of InterVarsity violates the church autonomy doctrine. ........ 10

1. SUNY Broome has violated InterVarsity's right to select its leadership. ........ 10

2. SUNY Broome has violated InterVarsity's right to set internal standards of belief. ........ 13

B. SUNY Broome's exclusion of InterVarsity violates its free-exercise rights. ........ 15

1. SUNY Broome has denied access to benefits based on religious exercise. ........ 15

2. SUNY Broome fails strict scrutiny. ........ 17

C. SUNY Broome's exclusion of InterVarsity violates its free-speech rights. ........ 19

D. SUNY Broome's exclusion of InterVarsity violates its free-association rights. ........ 22

II. InterVarsity satisfies the remaining preliminary-injunction factors. ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........ 22

*Belya v. Kapral*,
---F.4th---, 2026 WL 2408741 (2d Cir. Aug. 18, 2026) ........ 10, 13, 14

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ........ 22, 23

*Bus. Leaders in Christ v. Univ. of Iowa*,
2018 WL 4701879 (S.D. Iowa Jan. 23, 2018) ........ 24, 25

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000) ........ 20

*Carson v. Makin*,
596 U.S. 767 (2022) ........ 15, 16, 17

*Christian Legal Soc'y v. Martinez*,
561 U.S. 661 (2010) ........ 16-17, 19, 20, 21

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........ 13, 22, 23, 24

*Conlon v. InterVarsity Christian Fellowship*,
777 F.3d 829 (6th Cir. 2015) ........ 11

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ........ 14

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ........ 15

*Fellowship of Christian Athletes v. District of Columbia*,
743 F. Supp. 3d 73 (D.D.C. 2024) ........ 13, 18, 24, 25

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ........ 18, 22, 24, 25

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ........ 22, 24

*Fratello v. Archdiocese of NY*,
863 F.3d 190 (2d Cir. 2017)....................10, 11

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)....................17, 19

*Green v. Miss U.S. of Am.*,
52 F.4th 773 (9th Cir. 2022) ....................20

*Healy v. James*,
408 U.S. 169 (1972)....................16, 24

*Hosanna-Tabor v. EEOC*,
565 U.S. 171 (2012).................... *passim*

*Hsu v. Roslyn Union Free Sch. Dist.*,
85 F.3d 839 (2d Cir. 1996).................... *passim*

*InterVarsity Christian Fellowship v. Bd. of Governors of Wayne State Univ.*,
534 F. Supp. 3d 785 (E.D. Mich. 2021)....................11, 13

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
408 F. Supp. 3d 960 (S.D. Iowa 2019) ....................18

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
5 F.4th 855 (8th Cir. 2021) ....................16, 24

*Kedroff v. St. Nicholas Cathedral*,
344 U.S. 94 (1952)....................10

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................17

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................17, 19, 24

*Matal v. Tam*,
582 U.S. 218 (2017)....................19

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
160 F.4th 360 (2d Cir. 2025) ....................9, 24

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)....................9, 25

*Nken v. Holder*,
556 U.S. 418 (2009)....................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020).................... *passim*

*Penn v. N.Y. Methodist Hosp.*,
884 F.3d 416 (2d Cir. 2018)....................11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................19, 20, 21

*Rweyemamu v. Cote*,
520 F.3d 198 (2nd Cir. 2008)....................11

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976)....................14

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022)....................18

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023)....................23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)....................15, 16

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)....................25

*Watson v. Jones*,
80 U.S. (13 Wall.) 679 (1872)....................14

## INTRODUCTION

This case is about a Christian student group that was denied recognition as an official student group at a public college solely because it asks its leaders to sincerely agree with its Christian faith.

For over 50 years, InterVarsity Christian Fellowship has served on SUNY campuses, and it has welcomed all students to participate in its activities and receive the community services it offers. As a matter of religious exercise, however, InterVarsity requires that its student leaders—who lead members in prayer, worship, and religious teachings—sincerely agree with InterVarsity's core religious beliefs. But because InterVarsity simply asks its leaders to believe what it believes, SUNY Broome Community College denied InterVarsity official recognition as a student group, claiming that its religious leadership requirement violates the college's non-discrimination policy.

SUNY Broome's exclusion of InterVarsity violates the Constitution several times over.

*First*, it violates the First Amendment's church autonomy doctrine. The Supreme Court has made clear that religious organizations get to insist on faithful leaders, a right rooted in 150 years of precedent emphasizing that religious groups have the right to decide for themselves, free from state interference, matters of internal religious governance, faith, and doctrine. But SUNY Broome's bar on religious leadership standards here do more than merely interfere in these matters—they seek to control a core component of InterVarsity's governance, faith, and doctrine.

*Second*, SUNY Broome's bar violates the Free Exercise Clause. In a trilogy of recent cases, the Supreme Court has made clear that governments cannot deny religious groups access to benefits solely because of their religious exercise. But that's exactly what happened here. Because InterVarsity exercises its religion by requiring its leaders to sincerely agree with its beliefs, SUNY Broome denied InterVarsity access to the substantial benefits available to other recognized student groups.

*And third*, SUNY Broome's bar violates InterVarsity's rights to free speech and association. SUNY Broome's restriction on InterVarsity's religious leadership requirement inescapably and uniquely burdens the content of InterVarsity's religious viewpoint. Prayer and worship don't have the same meaning when voiced by an unbeliever. Forcing InterVarsity to accept leadership from those who don't share—and may openly disagree with—its religious beliefs fundamentally redefines its expression.

The 2026-27 academic year has already begun, and InterVarsity's meetings are underway. SUNY Broome's actions put severe burdens on InterVarsity, including being denied the ability to reserve campus space, receive funding, or recruit new members through the student activities fair hosted each semester. Thus, absent the kind of emergency preliminary injunctive relief that the Second Circuit, Ninth Circuit, and other courts have regularly granted to student groups denied recognition for their religious leadership standards, InterVarsity faces imminent, irreparable harm every week that SUNY Broome continues to deny it official recognition. The Court should grant a preliminary injunction allowing InterVarsity to be recognized and to obtain the access and benefits to which other recognized student groups are entitled.

## FACTUAL BACKGROUND

***InterVarsity's history, ministry, and religious beliefs.*** InterVarsity exists "to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord." Declaration of Gregory Jao ¶ 4; Jao Ex. A at 1. It was founded by students at the University of Cambridge in 1877. Jao Decl. ¶ 6. In 1938, University of Michigan students formed the first InterVarsity chapter in the United States. *Id.* Today, InterVarsity serves more than 78,000 students and faculty across over 1,000 chapters, all united by their shared religious mission. *Id.* ¶ 5.

InterVarsity has served campuses in New York since at least the 1960s and currently has chapters on over 45 college campuses across the state, including at Columbia University, Cornell University, and Syracuse University. *Id.* ¶ 7. InterVarsity has been ministering in the State University of New York (SUNY) system since at least 1967 and currently has recognized student clubs on many SUNY campuses, including Alfred State College, Stony Brook University, SUNY Buffalo, SUNY Binghamton, and SUNY Geneseo. *Id.* ¶ 8.

InterVarsity chapters regularly meet to express and exercise InterVarsity's religious beliefs. *Id.* ¶¶ 11-12. Those beliefs are articulated in InterVarsity's statement of beliefs, and they include that all humans have inherent dignity and value because they are created in God's image; God is Triune; Scripture is authoritative; Jesus Christ was divine, sinless, and died a substitutionary death followed by a bodily resurrection; and humans can be saved from their sin and reunited with God by God's grace and by faith in Christ's sacrifice. *Id.* ¶ 11; Jao Ex. C at 1-2; Declaration of Jacob Sonner ¶ 7. The ways in which individual chapters serve their campuses can vary, but they mainly include leading religious teaching and Bible studies, worship services, and times of communal prayer. Declaration of Sophia Chan ¶¶ 7-9. Chapters also recruit and build community by facilitating gatherings where students can fellowship together, study, eat snacks, drink coffee, and play games; organizing retreats where students can be encouraged and rejuvenated; and providing free flower bouquet making events, Zumba workout classes, pumpkin painting events, ice cream socials, and build-a-bear workshops. *Id.* ¶ 38; Sonner Decl. ¶ 6. Additionally, InterVarsity chapters have provided thousands of hours of community service, including service aimed at poverty relief, hunger alleviation, and welcoming and supporting new and international students to campus. Jao Decl. ¶ 10; Jao Ex. B at 6-7.

***InterVarsity's beliefs regarding leadership.*** InterVarsity welcomes all students and faculty to join its events and meetings and invites all students to join as members. Jao Decl. ¶¶ 9, 14; Chan Decl. ¶ 28; Sonner Decl. ¶¶ 6-7. InterVarsity regularly has individuals of different religious backgrounds, or no religious background, who attend its events and meetings. Jao Decl. ¶ 14.

While anyone is welcome to participate in its chapters, InterVarsity requires its student leaders to agree with and exemplify InterVarsity's Christian beliefs. *Id.* ¶¶ 15-23; Chan Decl. ¶¶ 10-11; Sonner Decl. ¶¶ 7-8, 12. This religious leadership requirement is necessary because student leaders hold important positions of spiritual leadership within their chapters, and they are the primary representatives of InterVarsity's beliefs to both the members of their local chapters and the student bodies of their schools. Jao Decl. ¶¶ 13, 15; Chan Decl. ¶ 6.

While student leaders may have other duties specific to their leadership role (*e.g.*, treasurer duties), their main responsibility is to express and model InterVarsity's religious beliefs. Jao Decl. ¶¶ 16-18. For instance, student leaders run the two basic group meetings InterVarsity chapters hold on a regular basis—Bible studies and religious services. Chan Decl. ¶¶ 7-9. They also determine the content of InterVarsity's message, including by spearheading the groups' Bible studies; leading prayer, worship, evangelism, and religious teaching; helping decide meetings' religious content; selecting guest speakers and identifying religious topics to cover during campus events; communicating InterVarsity's message to their respective campus communities; and planning activities to advance the chapter's religious mission. Chan Decl. ¶ 6; Sonner Decl. ¶ 9. Accordingly, student leaders are held to biblical standards for leadership, and each leader is expected to perform any of the religious duties of the club. Jao Decl. ¶ 17. Before students accept a leadership role, they must review and agree with InterVarsity's statement of faith. Chan Decl. ¶ 11.

Having student leaders who agree with InterVarsity's religious beliefs is a matter of basic institutional integrity. Jao Decl. ¶ 19. To retain its identity and to carry out its religious mission—*i.e.*, to be the "InterVarsity *Christian* Fellowship"—InterVarsity needs leaders who themselves embrace and follow InterVarsity's religious beliefs and mission. *Id.* Otherwise, Plaintiffs' entire mission—their Bible studies, prayers, evangelism, and worship—would be hollow, inauthentic, and unlikely to endure. *Id.* It's also a matter of personal integrity: Plaintiffs cannot knowingly ask students who do not share their beliefs to act inauthentically by leading members in prayer or conveying InterVarsity's religious beliefs. *Id.* ¶ 20. Otherwise, InterVarsity would suggest to students that sincere personal faith is unnecessary to Christian life and that it is sufficient to "go through the motions." *Id.* ¶ 21. Plaintiffs do not believe that is true. Rather, InterVarsity believes faked faith is not faith at all and that pretending to believe is harmful for everyone involved. *Id.*

Candidates for an InterVarsity chapter's leadership are faithful Christian students who are humble, willing to serve, and able to minister. Chan Decl. ¶ 16; Jao Decl. ¶ 22. Since its founding, InterVarsity has trained students interested in leadership roles. Jao Decl. ¶ 23. This instruction includes how to lead Bible studies, model Christian beliefs, conduct Christian discipleship, and lead InterVarsity ministries on campus. InterVarsity also provides annual retreats and conferences, such as its Basileia conference in the Adirondacks, where it instructs student leaders on how to faithfully lead InterVarsity chapters. Chan Decl. ¶¶ 13-14; *see generally* Chan Ex. A. And InterVarsity publishes books, articles, and online training courses to train student leaders. Jao Decl. ¶¶ 23-28; *see* Chan Ex. B; Jao Decl. ¶ 23; Jao Exs D, E. Ministry skills are further developed in sessions led by InterVarsity staff. Chan Decl. ¶¶ 13-15; Jao Decl. ¶¶ 28-29. Before taking leadership roles, students are invited to join an InterVarsity apprenticeship program that equips them with spiritual leadership skills. Jao Decl. ¶ 29.

This training carries on through the personal mentorship of InterVarsity staff. *Id.* ¶ 30; Chan Decl. ¶ 12; Sonner Decl. ¶¶ 11, 13. That highly relational process varies from student to student, but it often involves InterVarsity staff empowering students to lead Bible studies, campus events, or outreaches where students have the opportunity to tell other students about InterVarsity's faith and invite students to InterVarsity's programs. Chan Decl. ¶ 12; Jao Decl. ¶ 30. With newer leaders, InterVarsity staff will observe them week to week as they are ministering in these new contexts and provide specific feedback on how to better embody InterVarsity's faith. *Id.*

***InterVarsity at SUNY Broome.*** In April 2024, students at SUNY Broome and a group of staff and students from InterVarsity's chapter at SUNY Binghamton (InterVarsity Binghamton) felt called by God to support a new InterVarsity chapter at SUNY Broome (InterVarsity Broome). Chan Decl. ¶ 17. This started in August and September 2025, when a group of about a dozen SUNY Broome students would study the Bible and pray together. *Id.* ¶ 20. That Bible study formed the basis for InterVarsity Broome. *Id.* ¶ 18-25.

While InterVarsity Broome was able to meet outdoors on campus when the weather permitted or in public spaces when not in use, it could not reserve regular space at SUNY Broome for its meetings as an official student club, which depressed attendance and recruitment. *Id.* ¶ 27; *see also* Sonner Decl. ¶ 18. InterVarsity Broome also couldn't access other important recruitment tools and opportunities reserved for official student clubs, such as the ability to participate in the Student Activities and Services Fairs, access campus bulletin boards, set up recruitment tables on campus, reserve space for special events, or be listed on the SUNY Broome website as a recognized club that students could join. Chan Decl. ¶ 40; Sonner Decl. ¶ 19. These impediments restricted the club's health and growth and made it much more difficult to meet. Chan Decl. ¶ 40.

On-campus meetings are important for InterVarsity because they provide a safe, welcoming, and consistent space for students to meet and build community. *Id.* ¶ 27. That is especially true for community college chapters, where students generally commute to campus and often spend little time there. *Id.*; Sonner Decl. ¶¶ 15, 18. They also attend college for about half the time of students at four-year colleges, doubling the time pressure on engaging students. Thus, ministering to SUNY Broome students requires being where they are—on campus. Without access to campus and other benefits, it is effectively impossible to have a healthy chapter. Chan Decl. ¶ 36.

***SUNY Broome denies InterVarsity recognition.*** InterVarsity Broome selected Jacob Sonner to be its president in December 2025. *Id.* ¶ 24; Sonner Decl. ¶ 13; *see also* Chan Decl. ¶¶ 21-23 (describing the character of InterVarsity Broome's student leaders). On January 11, 2026, in accordance with SUNY Broome's Club Handbook procedures, Jacob started the process for InterVarsity Broome to obtain official recognition as a student club, including by submitting a proposed constitution. Chan Decl. ¶ 26; Sonner Decl. ¶ 16; Sonner Ex. B at 4; Sonner Ex. F. The constitution made clear that while InterVarsity welcomes all students as members, all student leaders are required to affirm InterVarsity's statement of beliefs (the "religious leadership requirement"). Chan Decl. ¶ 28; Sonner Decl. ¶ 20; Sonner Ex. A at 3.

Several weeks later, on January 27, Dr. Nicholas Kocieniewski, the Director of Student Activities at SUNY Broome who is ultimately responsible for granting official recognition to proposed student groups, responded to Jacob with edits and revisions to InterVarsity Broome's proposed constitution. Chan Decl. ¶ 28; Sonner Decl. ¶ 22; Sonner Ex. D. He emphasized that the religious leadership requirement "cannot be included" in the constitution. Sonner Ex. D at 3. In early February, Jacob emailed Dr. Kocieniewski that the chapter intended to retain the religious leadership requirement in its constitution. Chan Decl. ¶¶ 29-30; Sonner Decl. ¶ 23; Sonner Ex. E.

On February 20, Dr. Kocieniewski responded that refusing to remove the religious leadership requirement would mean that InterVarsity Broome would be barred from being recognized as an official student club. Chan Decl. ¶ 30; Sonner Decl. ¶ 24; Sonner Ex. F. Jacob and Sophia Chan, the InterVarsity Campus Minister assisting InterVarsity Broome, attempted to engage in further dialogue with Dr. Kocieniewski to explain that InterVarsity's religious leadership decisions were protected by federal law. Chan Decl. ¶ 30; Chan Ex. D; Sonner Decl. ¶ 25; Sonner Ex. G. But, on February 23, Dr. Kocieniewski replied that he had consulted with SUNY Broome's Vice President of Student Development and Chief Diversity Officer, Dr. Carol Ross-Scott, and determined that the religious leadership requirement violated "Section 2.2 of the Club Handbook" and "the SUNY Broome Non-Discrimination Statement (Policy No.: GA2001)." Chan Decl. ¶ 31; Sonner Decl. ¶ 27; Sonner Ex. H; *see also* Sonner Ex. B at 2; Declaration of Caleb Angell Ex. C. Dr. Kocieniewski further stated that "[t]hese policies have been reviewed by SUNY Broome's Legal Council [sic] and continue to apply in this case." Sonner Ex. H at 1; *see also* Angell Ex. B. On February 24, Dr. Kocieniewski formally rejected InterVarsity Broome's application. Chan Decl. ¶ 32; Sonner Decl. ¶ 28; Sonner Ex. I.

On March 23, in an effort to resolve the issue, Tom Lin, InterVarsity's President & Chief Executive Officer, sent a letter to SUNY Broome's President, Dr. Tony D. Hawkins, asking SUNY Broome to reconsider its decision. Jao Ex. F. On May 7, President Hawkins replied to Mr. Lin reaffirming the denial. Jao Ex. G.[1]

[1] SUNY Broome recently released its new Club Handbook for the 2026-27 academic year, which substantively tracks the one in effect during InterVarsity Broome's denial. Angell Ex. A.

***SUNY Broome has harmed InterVarsity.*** SUNY Broome's denial of recognition harms Plaintiffs' mission to establish and advance a witnessing community of students and faculty who follow Jesus. Chan Decl. ¶¶ 45-47; Jao Decl. ¶ 40; Sonner Decl. ¶¶ 4, 29. The denial of recognition stigmatizes InterVarsity's religious beliefs and hinders their speech and religious exercise by denying them equal access to campus resources and generally available benefits. Chan Decl. ¶ 50; Sonner Decl. ¶ 29. Plaintiffs have been forced to expend significant time and resources addressing these injuries to their constitutional and statutory rights. Chan Decl. ¶¶ 44-45; Jao Decl. ¶¶ 38-40.

Those harms are ongoing. This academic year, which began on August 24, SUNY Broome continues to refuse to let InterVarsity have access to the benefits available to all other student groups. And it imposes this restriction expressly and solely because InterVarsity requires its ministry to be led by students who share its religious beliefs. That constitutes current and ongoing First Amendment violations, warranting immediate judicial intervention.

## LEGAL STANDARD

A preliminary injunction is appropriate when the plaintiff shows that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [its] favor," and (4) "an injunction is in the public interest." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025). When, as here, "the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

The First Amendment prohibits SUNY Broome from impinging InterVarsity's right to ask its leaders to sincerely agree with its religious beliefs.

**A. SUNY Broome's exclusion of InterVarsity violates the church autonomy doctrine.**

The church autonomy doctrine, a protection "rooted in both" the Free Exercise Clause and Establishment Clause, "ensures that religious associations have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Belya v. Kapral*, ---F.4th---, 2026 WL 2408741, at *6 (2d Cir. Aug. 18, 2026) (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020)). SUNY Broome has violated the doctrine in two ways. First, it has interfered in a "component" of the doctrine—the "ministerial exception"—which protects a religious group's "control over the selection of those who will personify its beliefs.'" *Id.* *4 n. 5, *6 (quoting *Our Lady*, 591 U.S. at 746; *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188 (2012)). Second, by specifically barring InterVarsity's requirement of sincere religious belief, SUNY Broome has also impermissibly intruded into "matters of faith, doctrine, [and] governance." *Id.* at *6.

**1. SUNY Broome has violated InterVarsity's right to select its leadership.**

Under the ministerial exception, "the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Fratello v. Archdiocese of NY*, 863 F.3d 190, 203 (2d Cir. 2017) (quoting *Hosanna-Tabor*, 565 U.S. at 195). Protecting "a religious group's right to shape its own faith and mission" requires respecting the right of such groups to decide—"free from state interference"—who "will preach their beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor*, 565 U.S. at 186, 188, 196 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). That right is violated if (1) a "religious group," (2) is selecting "one of the group's ministers," and (3) the government is "interfering with the freedom of [the] religious group[ ]" to make that selection. *Id.* at 177, 184; *Fratello*, 863 F.3d at 198, 200. All three elements are met here: InterVarsity is a religious group, its student leaders are its ministers, and SUNY Broome is blatantly interfering in their selection.

***Religious organization.*** The ministerial exception protects "religious groups … whose missions are marked by clear or obvious religious characteristics." *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 424-25 (2d Cir. 2018) (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (cleaned up)). Protected religious groups go beyond traditional churches, synagogues, mosques, and other houses of worship, and include groups such as InterVarsity. *Conlon*, 777 F.3d at 834. And rightly so, since a religious student group is "still a religious community that has the same need to define itself as other religious communities." *Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839, 869 (2d Cir. 1996). Here, the shared mission of InterVarsity and InterVarsity Broome is expressly and unmistakably religious in nature. Jao Decl. ¶¶ 4-14; Sonner Decl. ¶¶ 3-6, 9. And they openly carry out that mission in obviously religious ways, such as Bible studies, worship, and prayer. *Id.* InterVarsity thus "clearly" qualifies as a protected religious group given "not only its Christian name, but [also] its mission of Christian ministry and teaching." *Conlon*, 777 F.3d at 834; *accord InterVarsity Christian Fellowship v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 807 (E.D. Mich. 2021); *Penn*, 884 F.3d at 424 (quoting with approval *Conlon*'s recognition that InterVarsity is "a 'religious group' under *Hosanna-Tabor*" because it "is a Christian organization" whose "purpose it to advance the understanding and practice of Christianity in colleges and universities").

***Religious leaders.*** The ministerial exception covers roles that are expected to "perform[ ] important religious functions for [a] religious organization." *Fratello*, 863 F.3d at 209 (cleaned up). Importantly, this "protects more than just 'ministers,'" a religion-specific term which reflects merely "judicial shorthand." *Rweyemamu v. Cote*, 520 F.3d 198, 206-07 (2nd Cir. 2008) (noting the exception's application to a "press secretary," "staff of [a] Jewish nursing home," and an "organist/music director"); *Fratello*, 863 F.3d at 205 ("it would be a mistake if the term minister"

was "viewed as central to the important issue of religious autonomy" at issue) (cleaned up). Rather, to account for the many religious roles within our nation's "rich diversity" of faith groups," in determining the roles that are protected by the exception, "[w]hat matters, at bottom, is what [the role] does." *Our Lady*, 591 U.S. at 753, 756. And, specifically, whether an individual holding the role "leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id.* at 754 (cleaned up). Any of those functions can demonstrate that the exception applies. *See, e.g.*, *id.* at 755-56 (primarily relying on teaching function to confirm ministerial status).

InterVarsity's student leaders do *all* those functions—lead ministry, conduct worship, and serve as both messengers and teachers of InterVarsity's faith. Chan Decl. ¶¶ 5-8; Jao Decl. ¶¶ 15-18; Sonner Decl. ¶¶ 8-10. They are expected to preach and teach InterVarsity's Christian beliefs; to lead Bible studies, worship events, and prayer vigils; to organize the content of religious meetings; and to guide the group's evangelism and outreach. *Id.* In fact, such core religious functions are virtually *all* that they do for InterVarsity—the role has few other duties. Jao Decl. ¶ 18; Sonner Decl. ¶¶ 9-10. Thus, this is a clear-cut case.

Other indicia of ministerial status confirm that conclusion. These include that InterVarsity holds out its student leader role as requiring significant spiritual commitment; that InterVarsity provides substantial, detailed, and personal religious training on religious leadership to its student leaders; and—as particularly relevant here—that InterVarsity uniquely requires its leaders to sincerely believe and follow its religious beliefs. Chan Decl. ¶¶ 9-15, 20-23, 27-28; Jao Decl. ¶¶ 15-31; Sonner Decl. ¶¶ 7-8, 11-14; *see also Hosanna-Tabor*, 565 U.S. at 191 (finding religious training, beliefs, and holding a "role distinct from that of most of [the ministry's] members" as supporting ministerial status). Thus, the student leaders who InterVarsity has entrusted to

"personify its beliefs," *id.* at 188, hold "highly religious positions that serve a leading role in advancing Plaintiffs' faith and mission on [SUNY Broome's] campus and, as a matter of law, ... are ministers under the First Amendment." *Wayne State*, 534 F. Supp. 3d at 810.

***Government interference.*** SUNY Broome's actions interfere with InterVarsity's "authority to regulate the character and conduct of its leaders" and unlawfully restrict its "autonomy in selecting" them. *Belya*, 2026 WL 2408741, at *7-8 (cleaned up). There "can be no clearer example of an intrusion into the internal structure or affairs" of a religious student group than for the government to force it to accept leaders who do not share its faith, since that ultimately "would cause the group as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006) (protecting religious student group's religious leadership policy); *accord Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 83 (D.D.C. 2024) (*FCA-DC*) (denying recognized status because of religious leadership requirement substantially burdened religious group by depriving it of "control over the selection of [its] ministerial leadership"). Yet SUNY Broome has repeatedly made clear that intrusion is the price InterVarsity must pay to establish a club that can effectively accomplish its religious mission. Jao Ex. G; Sonner Exs. F, H, and I. SUNY Broome's policy thus constitutes the kind of "attempt by the government to dictate or ... influence" who leads a religious organization that both "violate[s] the free exercise of religion" and "constitute[s] one of the central attributes of an establishment of religion." *Belya*, 2026 WL 2408741, at *6 (quoting *Our Lady*, 591 U.S. at 746).

**2. SUNY Broome has violated InterVarsity's right to set internal standards of belief.**

Compounding its error, SUNY Broome specifically bars requiring InterVarsity leaders to affirm and practice its faith. Regardless of whether student leaders meet the legal definition of "ministers," then, that bar violates the Religion Clauses because it intrudes into a core matter of faith, doctrine, and religious governance. *Belya*, 2026 WL 2408741, at *8 (church autonomy can

apply "regardless" of ministerial status). And the intrusion here is pernicious. It deprives religious groups of their "unquestioned" right to govern their "voluntary religious associations," including by setting "the standard[s] of morals" for those who guide their prayers, worship, and teaching. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 711, 714 (1976) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728-729, 733 (1872)). And it not only interferes with some matters of faith and doctrine, *Belya*, 2026 WL 2408741, at *6, but also prevents InterVarsity from requiring faithful practice or orthodox doctrine at all.

These harms undermine church autonomy's protection for a religious group's "expression and dissemination of [its] religious doctrine." *Milivojevich*, 426 U.S. at 711 (quoting *Watson*, 80 U.S. (13 Wall) at 728). For InterVarsity, sincere belief is a prerequisite to sharing its faith; "both the content and the credibility" of InterVarsity's message "depend vitally on the character and conduct" of its messengers. *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring); Chan Decl. ¶¶ 9-10, 20-23; Jao Decl. ¶¶ 18-21; Sonner Decl. ¶¶ 7-8, 12. SUNY Broome's intrusion thus denies InterVarsity's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746.

As Judge Van Graafeiland explained about a high school religious club's religious leadership requirement, "the right to select" faithful officers is "solely the prerogative of [a] concededly religious club" because such "religious organizations have ... autonomy in ordering their internal affairs" and "select[ing] their own leaders." *Hsu*, 85 F.3d at 873 (quoting *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 341-42 (1987) (Brennan, J., concurring)). So too here. And that right is not subject to any balancing against governmental interests. Rather, the First Amendment has "struck the balance" in favor of respecting a religious group's autonomy in selecting those "who will guide it on its way." *Hosanna-Tabor*, 565 U.S. at 196.

**B. SUNY Broome's exclusion of InterVarsity violates its free-exercise rights.**

**1. SUNY Broome has denied access to benefits based on religious exercise.**

SUNY Broome's denial of recognized status to InterVarsity also violates the Free Exercise Clause. In a trilogy of recent cases, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because "of their religious exercise." *Carson v. Makin*, 596 U.S. 767, 778, 789 (2022). By "disqualifying otherwise eligible recipients" from receiving a benefit solely because of their lawful religious exercise, the government "imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020). Such religious discrimination is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

*Carson* is the most recent of the trilogy. There, Maine had offered "its citizens a benefit" by providing tuition assistance payments to families whose school districts didn't "provide a public secondary school." 596 U.S. at 780. But that benefit came with strings attached: Maine "disqualified" religious institutions from being able to accept these tuition assistance payments "because of their religious character." *Id.* And by "conditioning the availability of benefits in that manner," the Supreme Court held, Maine's tuition assistance program "effectively penalize[d] the free exercise of religion." *Id.* (cleaned up) (quoting *Trinity Lutheran*, 582 U.S. at 462).

Maine argued that its exclusion did not run afoul of *Trinity Lutheran* and *Espinoza* because, rather than discriminate based on religious "status," its program instead imposed restrictions on "religious exercise"—that is, on how a school's religious mission required it to provide a religious education. *Id.* at 785-86. But "[t]hat premise," the Court explained, "misreads our precedents." *Id.* at 787. While *Trinity Lutheran* and *Espinoza* may have "held that the Free Exercise Clause forbids discrimination on the basis of religious status," "those decisions never suggested that use-based

discrimination is any less offensive." *Id.* Indeed, "[a]ny attempt to give effect to such a distinction by scrutinizing whether and how a religious [group] pursues its [religious] mission would … raise serious concerns about state entanglement with religion and denominational favoritism." *Id.* (citing *Our Lady*, 591 U.S. at 759-62).

*Carson* "resolve[s] this case." *Id.* at 780. SUNY Broome offers recognized student groups substantial, important benefits by providing them with funding and the ability to "hold meetings and events, use/raise money, recruit new members, reserve space, and publish materials." Angell Ex. A at 31. Yet SUNY Broome denies these benefits to InterVarsity solely because InterVarsity and its chapters exercise their religion by requiring their student leaders to agree with InterVarsity's core religious beliefs. *See* Jao Ex. G at 1; Sonner Ex. H at 1; *see also supra* pp. 3-4 (discussing InterVarsity's religious exercise). Longstanding "free exercise principles governing any such public benefit program" prohibit "denying [a] benefit based on a recipient's religious exercise" unless it can pass "the strictest scrutiny." *Carson*, 596 U.S. at 780, 785.

In fact, the harm imposed by SUNY Broome here is worse than that in cases like *Trinity Lutheran*. While there, the discrimination "in all likelihood" resulted in just "a few extra scraped knees," 582 U.S. at 467, here, SUNY Broome's discrimination forces InterVarsity to forego the many substantial benefits that are essential to "remain[ing] a viable entity in a campus community," *Healy v. James*, 408 U.S. 169, 181-82 (1972); *accord InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 862 (8th Cir. 2021) (deregistration caused student group to "struggle[ ] with recruiting members, organizing activities" and caused the group to lose "a significant number of members"); Sonner Decl. ¶ 29; Jao Decl. ¶ 35; Chan Decl. ¶¶ 49-50.

Nor does *Christian Legal Soc'y v. Martinez* dictate otherwise. *Martinez*, which evaluated a challenge to a ban on religious standards that also encompassed club membership, was primarily

a free speech decision that addressed the Free Exercise Clause in a footnote. 561 U.S. 661, 697 n.27 (2010). The three sentences of analysis in that footnote is displaced and outweighed by the three later precedential rulings of the Supreme Court on how to apply the Free Exercise Clause in the context of a public benefits program. *Carson*, 596 U.S. at 780. And while *Martinez* suggested there may not be "preferential" constitutional treatment for a club's standards encompassing *members*, that doesn't control the Court's subsequent unanimous recognition of the First Amendment's "special solicitude" regarding standards solely for *leaders*. *Hosanna-Tabor*, 565 U.S. at 189.

**2. SUNY Broome fails strict scrutiny.**

Because SUNY Broome's application of its non-discrimination policy "'effectively penalizes the free exercise' of religion," it "must be subjected to the 'strictest scrutiny.'" *Carson*, 596 U.S. at 780. Strict scrutiny means that "the burden shifts to" SUNY Broome to show that "its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531-32 (2022). To satisfy it, SUNY Broome's policy must serve an "interest[ ] of the highest order." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). And the policy must be "necessary to serve that interest." *Mahmoud v. Taylor*, 606 U.S. 522, 566 (2025). Here, SUNY Broome's religious discrimination fails this test.

***Compelling interest.*** SUNY Broome has no reasonable interest—much less a compelling one—in forcing InterVarsity *Christian* Fellowship to accept any leader regardless of their "religion." Angell Ex. A at 3. Students come to InterVarsity groups to pray, worship, and learn about God. That can't happen without leaders who believe in the God that the group is praying to, worshipping, and learning about. Thus, instead of serving SUNY Broome's stated goal of "welcom[ing] the engagement of students with the InterVarsity Christian Fellowship," it destroys it. Jao Ex. G and 1.

True, SUNY Broome claims an interest in creating a nondiscriminatory environment. *Id.*; *see also* Angell Ex. B at 2-3. But for a religious group to have religious leaders isn't invidious discrimination; it's basic integrity. *Hsu*, 85 F.3d at 869, 871 (religious leadership rule is not "invidious in a religious club," but rather "vital" to its "religious mission"). Regardless, an "interest in maintaining an equitable environment free of discrimination" is "'standardless' and 'not sufficiently coherent for purposes of strict scrutiny'" since a court has "no way to 'measure'" it in a meaningful way. *FCA-DC*, 743 F. Supp. 3d at 87 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 213-16 (2023)). And even if the court could evaluate such a standard, the government still doesn't have a compelling interest in promoting inclusiveness at the price of excluding religious groups. *Cf. Singh v. Berger*, 56 F.4th 88, 98 (D.C. Cir. 2022) (military interest in "forging unit cohesion and a uniform mindset" insufficient to justify burden on religious exercise). That's doubly so when SUNY Broome doesn't hold its own programs to similarly high standards. *See, e.g.*, Angell Ex. E at 1-2. While SUNY Broome's goals are "commendable" in the abstract, *FCA-DC*, 743 F. Supp. 3d at 87, they fall far short of justifying its burdening of InterVarsity's religious exercise, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc).

***Least restrictive means.*** Even if SUNY Broome had a compelling interest, it would still fail on least restrictive means. That's because it used a hatchet when it could have used a scalpel. *See InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 985 (S.D. Iowa 2019) (denying recognition is an "extreme step"). Indeed, SUNY Broome could have pursued its goal by crafting a policy that generally prohibited invidious discrimination while still exempting religious student groups' religious leadership requirements, but it chose not to—presumably because the SUNY General Counsel's Office suggested that such an approach would be too

"complex[ ]." Angell Ex. B at 2. But "[t]here is no *de maximis* exception to the Free Exercise Clause," *Mahmoud*, 606 U.S. at 567, and the government cannot reject a lesser restrictive means simply because its implementation might be more involved, *Fulton*, 593 U.S. at 541 ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so."). That's particularly true here, where numerous other campuses—including those in the SUNY system—have long recognized InterVarsity groups. *See* Jao Decl. ¶¶ 6-8.

Nor, again, are SUNY Broome's goals in fostering an inclusive environment undermined by permitting a religious group to reserve leadership to persons who share the group's faith. Rather, they are enhanced. *All* students will be welcome to InterVarsity's services. Those who share its faith will be able to join in its religious observances, while those who don't will benefit from being exposed to authentic faith differences in a respectful and welcoming environment. That would advance the kind of tolerance, cooperation, mutual respect, and confident pluralism that our Nation's highest ideals reflect. Defendants' actions, by contrast, do not come close.

**C. SUNY Broome's exclusion of InterVarsity violates its free-speech rights.**

SUNY Broome's actions also violate the Free Speech Clause. Under that Clause, when the government creates a limited public forum, "some content- and speaker-based restrictions may be allowed." *Matal v. Tam*, 582 U.S. 218, 243 (2017). But the government can never "discriminate against speech on the basis of viewpoint," or otherwise "exclude speech where [doing so] is not 'reasonable in light of the purpose served by the forum.'" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Here, SUNY Broome created a limited public forum when it allowed student groups to receive official recognition and special benefits. *Martinez*, 561 U.S. at 679. And excluding InterVarsity from that limited public forum because it maintains religious leadership requirements is both viewpoint discriminatory and unreasonable given the purpose of the forum. Thus, SUNY Broome has doubly violated InterVarsity's free-speech rights.

***Viewpoint discrimination.*** First, SUNY Broome's exclusion of InterVarsity discriminates against InterVarsity because of its religious viewpoint. A public college discriminates based on viewpoint when its actions stem from the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

Here, SUNY Broome's bar on selecting religious leadership requirement inescapably discriminates against InterVarsity's religious speech. The leadership of a group inherently influences the expression of the group: "[*w*]*ho* speaks on [a club's] behalf … colors *what* concept is conveyed." *Martinez*, 561 U.S. at 680. The group's "choice of candidate is [thus] the most effective way in which that [association] can communicate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000); *Green v. Miss U.S. of Am.*, 52 F.4th 773, 788 (9th Cir. 2022).

This "principle applies with special force with respect to religious groups." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring). Simply put, because "a wayward [leader]'s preaching, teaching, and counseling could contradict the [group's] tenets and lead the congregation away from the faith," *Our Lady*, 591 U.S. at 747, "there can be no doubt that the messenger matters" when it comes to the "expression" of religious belief, *Hosanna-Tabor*, 565 U.S. at 200-01(Alito, J., joined by Kagan, J., concurring). Thus, a religious "club's Christian officer requirement" is "essential to the expressive content of [its] meetings." *Hsu*, 85 F.3d at 848.

Just so here. InterVarsity's "student leaders are the primary embodiment of InterVarsity's faith and Christian message on campus," they "determine the content of an InterVarsity chapter's message," and they express that message through both their words and their faithful lives. Jao Decl. ¶¶ 15-16. It fundamentally undermines and alters InterVarsity's religious viewpoint to require it to accept student leaders who reject its religious beliefs. *Id.* ¶¶ 19-21.

Further, unlike in *Martinez*, it's unclear that SUNY Broome imposes its speech restriction on, for instance, political or ideological groups since politics and ideology are not protected categories in its nondiscrimination policy. Even if SUNY Broome *did* uniformly impose the restriction, though, it still creates unique pressure on InterVarsity's religious speech. A political group's message might be able to get by with leadership that doesn't agree with every plank in the party platform. But for InterVarsity and similar religious groups, "the nature and quality of [its] speech ... is dependent upon the religious commitment of [its] officers." *Hsu*, 85 F.3d at 857. For instance, "the prayers at a[n InterVarsity] meeting led by non-Christians would be different than the prayers led by Christians." *Id.* at 860; Jao Decl. ¶¶ 11-13 (explaining that sincere belief is an inescapable component of the message). Thus, SUNY Broome's ban on religious leadership requirements discriminates against and burdens InterVarsity's religious speech.

***Reasonableness.*** Second, SUNY Broome's exclusion of InterVarsity is also unreasonable because it undermines SUNY Broome's purpose for opening the student group forum. A content-based restriction is reasonable only if, after "taking into account the forum's function and all the surrounding circumstances," *Martinez*, 561 U.S. at 685 (cleaned up), that restriction "preserves the purposes of that limited forum" and "respects the lawful boundaries [the government] has itself set," *Rosenberger*, 515 U.S. at 829-30 (cleaned up).

SUNY Broome's forum exists to foster private student groups that give students room for "personal exploration" and "leadership," and to "help students feel at home in an environment that may otherwise feel foreign or intimidating." But forbidding religious groups from having religious leaders undermines the forum's purposes. Instead of allowing students to explore authentically different religious viewpoints, it bans certain views from campus. That *limits* exploration, it does not expand it. And excluding groups with religious leadership criteria shrinks the pool of available

groups that students could seek to lead, thus again diminishing the forum's ability to foster leadership opportunities. Similarly, the feeling of being "at home" can be enhanced by being able to gather with other likeminded students—something they can't do if student groups are required to hide their interests or beliefs. *FCA-San Jose*, 82 F.4th at 689 ("Individual preferences based on certain characteristics and criteria serve important purposes for these groups."). And it is "hardly a leap of logic" that student groups formed around certain interests and beliefs—especially religious ones—cannot survive without leaders who agree with those interests and beliefs. *Id.*; *cf. Hosanna-Tabor*, 565 U.S. at 201 (Alito J., joined by Kagan, J., concurring) ("A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses."). SUNY Broome's actions thus violate the Free Speech Clause.

**D. SUNY Broome's exclusion of InterVarsity violates its free-association rights.**

It has been "long understood" that each of the freedoms guaranteed by the First Amendment—"to speak, worship, publish, assemble, and petition the[ ] government"—"necessarily carries with it 'a corresponding right to associate with others.'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021)). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). The government violates this freedom of association when it "den[ies] benefits to an organization based on its message, or punish[es] individuals for their affiliations." *First Choice*, 146 S. Ct. at 1122; *see also Walker*, 453 F.3d at 861 (cannot discriminate against a group by "impos[ing] penalties or withhold[ing] benefits from individuals because" they associate for religious reasons).

The Second Circuit applies a "three-part inquiry for evaluating expressive association claims." *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023). It considers (1) "whether the group making the claim engaged in expressive association," (2) "whether the state action at issue significantly affected the group's ability to advocate its viewpoints," and (3) whether "the state's interest implicated in its action" overrides "the burden imposed on the associational expression." *Id.* If the state "imposes severe burdens on associational rights at the second step," this court applies "strict scrutiny … at the third step." *Id.* (cleaned up). InterVarsity's claim passes all three steps.

*First*, InterVarsity is the "archetype of associations formed for expressive purposes" since its "very existence is dedicated to the collective expression … of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring). It seeks to promote a core set of religious beliefs and doctrines through teaching Bible studies, prayer, worship, and other religious services. *See*, *e.g.*, Jao Decl. ¶¶ 11-13; Chan Decl. ¶¶ 6-8.

*Second*, SUNY Broome's denial of recognized status "significantly affect[s]" InterVarsity's "ability to advocate [its] viewpoints." *Dale*, 530 U.S. at 650. Again, InterVarsity's student leaders lead the organization, teach Bible studies, and lead prayers and other religious services. Being forced to accept as leaders individuals who refuse to ascribe to the group's religious beliefs and doctrines would force InterVarsity "to propound a point of view contrary to its beliefs," *id.* at 654, which is an impermissible restriction on its expressive association. *Walker*, 453 F.3d at 861 (finding that university violated free association rights by derecognizing religious student group for requiring leaders and members to agree with its faith).

*Third*, that "severe burden" on InterVarsity's associational rights triggers strict scrutiny, *Slattery*, 61 F.4th at 287, which SUNY Broome cannot meet, *see supra* pp. 17-19.

Finally, for the reasons explained above, *Martinez* doesn't control here: the issues presented here have been clarified by ensuing Supreme Court precedent about religious leadership, and SUNY Broome's restriction places unique burdens on InterVarsity's religious speech. *See supra* pp. 20-21. Further, more recent precedent has also clarified that association is a distinct right that receives distinct protection, because "[w]ithout such a right, no two men could safely share the same soapbox, no two women the same church," and "[t]he government could reduce any assembly to a party of one." *First Choice*, 146 S. Ct. at 1122 (noting that it "infringe[s] freedom of association" for government to "deny benefits to an organization based on its message").

## II. InterVarsity satisfies the remaining preliminary-injunction factors.

InterVarsity satisfies the remaining preliminary-injunction factors. It is likely to suffer irreparable harm in the absence of preliminary relief, the equities tip in its favor, and enjoining SUNY Broome here is in the public interest. *NIFLA*, 160 F.4th at 379.

***Irreparable harm.*** As shown above, SUNY Broome is violating InterVarsity's First Amendment rights. That violation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569. That principle has repeatedly been applied in cases where clubs have been denied recognition over their religious leadership policies. *See Hsu*, 85 F.3d at 872-73; *InterVarsity-Iowa*, 5 F.4th at 862; *FCA-San Jose*, 82 F.4th at 694-95; *Walker*, 453 F.3d at 867; *FCA-DC*, 743 F. Supp. 3d at 93-94. Further, InterVarsity also cannot receive access to benefits that are essential to its ability "to remain a viable entity in a campus community," *Healy*, 408 U.S. at 181, which courts have repeatedly recognized causes yet more irreparable harm, *FCA-San Jose*, 82 F.4th at 695; *FCA-DC*, 743 F. Supp. 3d at 93-94, *Bus. Leaders in Christ v. Univ. of Iowa,* 2018 WL 4701879, at *14 (S.D. Iowa Jan. 23, 2018). Thus, InterVarsity has made a very strong showing of irreparable harm.

***Public interest and balance of equities.*** The remaining factors—public interest and balance of equities—merge when the government is the opposing party. *New York*, 969 F.3d at 58-59 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And in a First Amendment case such as this one, they point in InterVarsity's favor as a matter of law: the public interest always favors the protection of constitutional rights. *Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025); *see also Hsu*, 85 F.3d at 873 (granting preliminary injunction to allow recognition of religious club); *FCA-San Jose*, 82 F.4th at 695 (same); *FCA-DC*, 743 F. Supp. 3d at 93-94; (same); *Bus. Leaders in Christ*, 2018 WL 4701879 (same).

**CONCLUSION**

The Court should grant this motion and enter a preliminary injunction.

Respectfully submitted this 28th day of August, 2026.

/s/ Caleb H. Angell
Mark Rienzi
Daniel H. Blomberg*
Colten L. Stanberry*
Richard C. Osborne*
Caleb H. Angell
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095
cstanberry@becketfund.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*