# Angell Exhibit B:

## SUNY Memo Re Addressing Discrimination by Campus Organizations

**Addressing Discrimination by Campus Organizations**

**By Dr. Adam J. Wolkoff, Assistant Director, Student Conduct Institute and Special Assistant Counsel, SUNY Office of General Counsel[1]**

**August 2021**

On June 22, 2021, the Department of Education's Office for Civil Rights published a "Notice of Interpretation" stating that Title IX's non-discrimination mandate includes an obligation to prevent and address discrimination against LGBTQIA+ students in education.[2] While this guidance was anticipated and generally is already part of institutional policy, it may raise questions at the intersection of Title IX and the First Amendment, including students' rights of free exercise of speech and religion and associational rights. For instance, could a campus religious organization, based a sincerely held religious belief, exclude a student from membership based on their sexual orientation or gender identity?

This memorandum outlines two approaches available to public postsecondary institutions who wish to govern the membership policies of student organizations. The simplest approach is a "take all comers" policy, as defined by the U.S. Supreme Court in *Christian Legal Society v. Martinez* (2010). Student organizations must accept any student who wishes to become a member, without regard to their personal beliefs or status.

Alternatively, an institution may create a non-discrimination policy that applies to all campus organizations. Students could form affinity groups and sort themselves based on their religious views, race, sex, or other protected characteristics. But if they seek to limit membership to individuals who share particular beliefs or status, they would need to apply for an exemption to the non-discrimination policy. Religious organizations could not be singled out for disparate treatment.

---

[1] Many thanks to legal intern Katherine Reid for contributing research to this project.

[2] Along with publishing its "Notice of Interpretation" in the Federal Register, OCR also issued a two-page resource guide. *See* Notice of Interpretation, 86 Fed. Reg. 32637 (June 22, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf; U.S. Dep't of Just. & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf.

Given the complexity of sorting out such exemptions in a viewpoint-neutral way, and the risk that administrators may face *personal liability* for mishandling these policies, it is advised that campuses continue to follow "take all comers" policies that do not permit exclusion on any ground. This approach should withstand Constitutional challenge while ensuring compliance with federal non-discrimination mandates and institutional equity goals. By contrast, exemption-based non-discrimination policies are difficult to enforce without raising Constitutional issues, particularly when the denial of an exemption (with the aim of enforcing anti-discrimination policies) may conflict with religious belief.

Another consideration favoring all-comers policies is their support in the U.S. Department of Education's 2020 Religious Liberty and Free Inquiry Final Rule. That Rule prohibits public institutions from denying "any student organization whose stated mission is religious in nature and that is at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution . . . because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs."[3] In the Preamble to this Final Rule, the Department stated that this regulation would not prohibit an institution from implementing an "authentic" all comers policy consistent with *Martinez*.[4]

**"Take All Comers" Policy**

Colleges and universities commonly require student organizations to agree to a "take all comers" policy as a condition of recognition and incorporate that membership policy in their organizational constitutions. For example, SUNY New Paltz requires:

> The group must create and complete a working constitution that is on file (in hard copy and electronically) with the Center for Student Engagement. This constitution must certify that policies, regulations, practices, etc. do not restrict membership on the basis of race, creed, natural origin, age, disability, sexual orientation, gender identity, marital status and further that the active student members have independent authority from the national organization to determine membership of the campus affiliate.[5]

Such "take all comers" or "all comers" policies received support from the U.S. Supreme Court in the 2010 *Martinez* opinion.[6] In a 5-4 decision, with Justice Ruth Bader Ginsburg drafting the majority opinion, the court held that a public law school could require that all Recognized Student Organizations (RSOs) comply with a nondiscrimination requirement that would mandate acceptance of "all comers." In the majority's view, these requirements were reasonable and viewpoint neutral.

---

[3] 85 Fed. Reg. 59916, 59980 (Sept. 23, 2020); 34 CFR § 75.500(d).
[4] 85 Fed. Reg. at 59939.
[5] https://www.newpaltz.edu/media/center-for-student-engagement/STUDENT%20ENGAGEMENT%20POLICIES%202020-2021.pdf
[6] Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez, 561 U.S. 661 (2010).

Under the nondiscrimination policy, all RSOs had to "allow any student to participate, become a member, or seek leadership positions" whatever their status or beliefs. Law students formed an organization called the Christian Legal Society (CLS) and applied for RSO status. The law school denied their application because the organization's bylaws excluded students based on religion and sexual orientation. Lower courts then denied the CLS' efforts to reverse this denial of recognition.

On appeal, the Supreme Court affirmed, holding that a public law school could condition recognition on the organization's agreement to open eligibility for its membership and leadership. Acknowledging that a public university could not deny "access to school-sponsored forums" based on the organization's viewpoint, the court held that the law school was not engaged in viewpoint discrimination through its "all comers" policy. The law school could not prohibit the organization's "expressive activity" but, at the same time, CLS did not have the right to claim a "preferential exemption" from the nondiscrimination policy.[7]

The Court explained that a state, acting through a public university, had the power to limited access to a "limited public forum" such as an RSO as long as its restrictions were reasonable and viewpoint neutral.[8] At the same time, the associational rights of students, including the right *not* to associate with unwelcome members, enjoy First Amendment protections, so any rule that restrained associational freedom was subject to "close scrutiny" and would be unconstitutional unless it served "compelling state interests" that are "unrelated to the suppression of ideas" and the interests could not be advanced by significantly less restrictive means.[9]

The Court decided that a "less restrictive level of scrutiny" could be applied to "expressive association" in a limited public forum like an RSO to align with existing speech regulation precedents in limited public forums, and also because public universities were already doing it: they "ordinarily, and without controversy" restrict membership in an RSO to only *students* as a condition of recognition. Most critically, these restrictions on association did not compel a group to accept members with no way to opt-out. Recognition through the RSO process was a "dangling the carrot of subsidy, not wielding the stick of prohibition." If an organization did not want to accept all-comers, they could simply not seek the university's subsidy.[10]

Importantly, the *Martinez* decision was narrowly decided, with four justices dissenting. Given the changed makeup of the Court over the past decade, the dissent may foreshadow the Court's future approach to "take all comers" policies. In particular, the dissent sharply disagreed with the majority's view on expressive association, finding that the "forced inclusion" of members whose presence would significantly affect a group's ability to advocate its viewpoints would be a First Amendment violation unless the government had a compelling interest that could not be met through significantly less restrictive means. A future Supreme Court panel,

---

[7] Id., at 669.
[8] *See* Widmar v. Vincent, 454 U.S. 263, 269–70 (1981); Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 835 (1995).
[9] Martinez, 561 U.S. at 679-680.
[10] Id., at 679-682.

hearing a similar case, might adopt this approach and find an all-comers approach invalid, particularly where it impacts religious expression.[11]

But under current precedent, a public university acts within the limits of the First Amendment when it requires all registered student organizations to agree to admit all students as members and leaders. As the *Martinez* court wrote, such policies avoid the need to draw distinctions between conduct and status-based judgments about membership decisions; otherwise, how would administrators determine if a student was excluded because of their LGBTQIA+ status (which would violate the anti-discrimination policy) or because they engaged in conduct that the group believed to be wrong?[12] And all-comers policy need not be a recipe for discord or sabotage: RSOs "may condition eligibility for membership and leadership on attendance, the payment of dues, or other neutral requirements designed to ensure that students join because of their commitment to a group's vitality, not its demise."[13] The existing framework for student governance should suffice to handle these sorts of conflicts within an all-comers approach.

**Non-Discrimination Policy with Exceptions**

Rather than require all-comers policies, some state universities have created an RSO framework that requires all RSOs to honor a non-discrimination policy while allowing student groups to seek an exemption letting them condition membership on affiliation with a status or belief.

While courts have recognized that an institution may have a compelling government interest in promoting affinity groups, any exemptions have to be issued in a viewpoint neutral way. In particular, a campus cannot deny exemptions to religious groups while continuing to recognize secular groups that deny membership to students of protected statuses.[14] Misapplication of these policies, in fact, can result in a public official being held personally liable for a constitutional violation.[15]

Recently, in a series of decisions, the U.S. Court of Appeals for the Eighth Circuit held that a non-discrimination policy for student organizations with exemptions for status or belief was reasonable and viewpoint neutral, while also holding that qualified immunity would not

---

[11] Id., at 731 (Alito, J., dissenting).
[12] Id., at 689.
[13] Id., at 693.
[14] Alpha Delta Chi-Delta Chapter v. Reed, 648 F.3d 790, 795 (9th Cir. 2011); Bus. Leaders in Christ v. Univ. of Iowa, 360 F. Supp. 3d 885, 898 (S.D. Iowa 2019), aff'd in part, rev'd in part and remanded, 991 F.3d 969 (8th Cir. 2021); Intervarsity Christian Fellowship/USA v. Univ. of Iowa, No. 19-3389, 2021 WL 3008743, at *5 (8th Cir. July 16, 2021).
[15] Intervarsity Christian Fellowship/USA, WL 3008743, at *8 (8th Cir. July 16, 2021) ("The University and individual defendants turned a blind eye to decades of First Amendment jurisprudence or they proceeded full speed ahead knowing they were violating the law. Either way, qualified immunity provides no safe haven.")

shield university officials who misapplied these policies in violation of students' religious freedom under the First Amendment.[16]

There, the University of Iowa required that RSOs agree to a non-discrimination policy as a condition of recognition. But the university also recognized certain non-religious organizations where language in their charters limited admission to students with similar ideological views or statuses.[17] The university, meanwhile, denied recognition to a Christian organization that would not allow an openly-gay student to serve on its board. The Eighth Circuit viewed this action as textbook viewpoint discrimination: a public university is barred from denying benefits to any student group based on that group's religious perspective. Because other groups with different viewpoints were recognized despite evident noncompliance, the court held that the only explanation for the Christian organization's non-recognition was its religious viewpoint.[18]

While the Eighth Circuit did not hold that the non-discrimination policy with exceptions approach was unconstitutional, its decisions do point to the challenge of implementing this method in an even-handed way. The court itself acknowledged that: "If the University honestly wanted a campus free of discrimination, it could have adopted an 'all-comers' policy like the one in *Martinez*."[19] In practice, it will be difficult for an administrator to justify excluding a religious organization from recognition based on its viewpoint concerning LGBTQIA+ students, while granting recognition to students who may seek to associate only with certain students on secular grounds (a group limited to Chinese students or female a cappella singers). The clearer approach is to simply require all RSOs to accept all-comers and use the existing tools of student organizational governance to manage any conflicts.

---

[16] Bus. Leaders in Christ, 991 F.3d 969; Intervarsity Christian Fellowship/USA, 2021 WL 3008743.
[17] Rather than a true "all comers" policy, the university permitted RSOs "free choice" in selecting members: "[A]ll registered student organizations [are] able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the [Human Rights Policy]. ... [T]herefore any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization." Intervarsity Christian Fellowship/USA, 2021 WL 3008743, at *1. *See, also*, Bus. Leaders in Christ, 991 F.3d at 973-74; ("[T]the University has approved the constitutions of numerous organizations that explicitly limit access to leadership or membership based on religious views, race, sex, and other characteristics protected by the Human Rights Policy. These groups include Love Works, which requires leaders to sign a 'gay-affirming statement of Christian faith'; 24-7, which requires leaders to sign and affirm a statement of faith and live according to a code of conduct (which includes abstaining from sexual conduct and relations outside of traditional marriage); House of Lorde, which implements membership 'interview[s]' to maintain 'a space for Black Queer individuals and/or the support thereof'; the Chinese Students and Scholars Association, which limits membership to 'enrolled Chinese Students and Scholars'; and Hawkapellas—Iowa, an 'all-female a cappella group' with membership controlled by 'vocal auditions.'")
[18] Bus. Leaders in Christ, 991 F.3d at 985. Amid the litigation involving Business Leaders in Christ, the university also deregistered other campus organizations with exclusionary policies on leadership based on religious belief, including the Intervarsity Christian Fellowship. That group sued in subsequent litigation and prevailed on appeal to the Eighth Circuit. Intervarsity Christian Fellowship/USA, 2021 WL 3008743, at *6.
[19] Intervarsity Christian Fellowship/USA, 2021 WL 3008743, at *6.