**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**INTERVARSITY CHRISTIAN FELLOWSHIP/USA and INTERVARSITY CHRISTIAN FELLOWSHIP OF SUNY BROOME,**

**Plaintiffs,**

**vs.**

**3:26-CV-1623 (MAD/MJK)**

**SUNY BROOME COMMUNITY COLLEGE, *et al.*,**

**Defendants.**

---

**APPEARANCES:** **OF COUNSEL:**

**THE BECKET FUND FOR RELIGIOUS LIBERTY**
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
Attorneys for Plaintiffs

**CALEB HENLEY ANGELL, ESQ.**
**MARK RIENZI, ESQ.**
**COLTEN L. STANBERRY, ESQ.**
**DANIEL H. BLOMBERG, ESQ.**
**RICH OSBORNE, ESQ.**

**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendants

**JACQUELINE ZAHN, ESQ.**
**SUZANNE M. MESSER, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

# MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION[1]

---

[1] A nearly identical lawsuit has been filed against Defendants (plus Dr. Scott Kane) by Campus Bible Fellowship at SUNY Broome Community College and Jacob Seachrist. *See Campus Bible Fellowship at SUNY Broome Cmty. Coll. v. SUNY Broome Cmty. Coll.*, No. 3:26-CV-1678, Dkt. No. 1 (N.D.N.Y. Sept. 3, 2026).

Plaintiffs InterVarsity Christian Fellowship/USA ("InterVarsity") and InterVarsity Christian Fellowship of SUNY Broome ("InterVarsity Broome") (collectively, "Plaintiffs") commenced this action on August 21, 2026. *See* Dkt. No. 1. The complaint names five Defendants: SUNY Broome Community College ("SUNY Broome"); the Board of Trustees of SUNY Broome;[2] Dr. Tony D. Hawkins, President of SUNY Broome, in his official and personal capacities; Dr. Carol Ross-Scott, Vice President for Student Development and Chief Diversity Officer, in her official and personal capacities; and Dr. Nicholas M. Kocieniewski, Director of Student Activities, in his official and personal capacities (collectively, "Defendants"). *See id.* at ¶¶ 16-20. The complaint alleges fourteen claims: (1) a violation of the ministerial exception of the United States Constitution's First Amendment; (2) a violation of the church autonomy doctrine of the First Amendment; (3-6) claims for violations of the Free Exercise Clause of the First Amendment; (7-9) claims for violations of the Free Speech Clause of the First Amendment; (10) a violation of the Assembly Clause of the First Amendment; (11) a violation of the Equal Protection Clause of the Fourteenth Amendment; (12) a violation of the New York State Human Rights law (N.Y. EXEC. LAW § 296(4)); (13) a violation of the free exercise of religion under Article I § 3 of the New York State Constitution; and (14) a violation of the freedom of speech under Article I § 8 of the New York State Constitution. *See id.* at ¶¶ 83-205.[3]

On August 28, 2026, Plaintiffs filed an emergency motion for a preliminary injunction seeking to enjoin Defendants from denying Plaintiffs official recognition as a student

---

[2] In their answer, Defendants assert that "[t]he Board of Trustees is not an entity separate from . . . SUNY Broome that is capable of being sued." Dkt. No. 31 at 1 n.1. The Court will address this at a later stage of the case should it be raised in a proper motion.

[3] Plaintiffs bring their United States Constitution claims pursuant to 42 U.S.C. § 1983.

organization. *See* Dkt. No. 24. According to Plaintiffs, the denial of official recognition "is in violation of Plaintiffs' rights under the First Amendment of the U.S. Constitution." *Id.* at 2.[4] On August 30, 2026, Defendants were ordered to show cause why they should not be: (1) preliminarily enjoined from denying Plaintiffs official recognition as a student group because they require their student leaders to agree with their religious beliefs; and (2) required to grant recognition to Plaintiffs, along with all the benefits of such recognition, while the case is pending. *See* Dkt. No. 25 at 1. Defendants oppose Plaintiffs' motion. *See* Dkt. No. 32. Plaintiffs subsequently filed a reply in support of their application for preliminary injunctive relief. *See* Dkt. No. 33.

For the reasons that follow, the Court denies Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND[5]

InterVarsity was founded by students at the University of Cambridge in 1877, and its purpose "is to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord." Dkt. No 24-8 at ¶¶ 4, 6; Dkt. No. 24-9 at 2. The first InterVarsity chapter in the United States opened at the University of Michigan in 1938, and student chapters have existed in New York since at least the 1960s. *See* Dkt. No. 24-8 at ¶¶ 6-7. "InterVarsity chapters meet regularly to advance InterVarsity's religious mission and reach others for Jesus Christ. The primary purposes of these meetings include expressing InterVarsity's religious beliefs and exercising those beliefs together in a communal setting." *Id.* at

---

[4] Unless otherwise noted, citations are to the pagination generated by CM/ECF.

[5] The factual allegations are derived from the declarations and exhibits attached to Plaintiffs' motion for a preliminary injunction and Defendants' response.

¶ 11. Those beliefs, which are articulated in InterVarsity's statement of beliefs, include the following:

> [I]ts Trinitarian theology and belief in the authority of Scripture; that all humans have inherent dignity and value because they are created in God's image; that Jesus Christ was divine and sinless; that he died a substitutionary death followed by a bodily resurrection; that people can be saved from their sin and reunited with God by God's grace and through faith in Christ's sacrifice; that God lives in believers in the form of the Holy Spirit; and that all believers are called to unity and to worship together in Christian communities.

*Id.*; *see* Dkt. No. 24-11 at 2-3; Dkt. No. 24-27 at ¶ 7.

According to Sophia Chan, an InterVarsity campus staff minister at the University of Binghamton and SUNY Broome, "InterVarsity began praying about planting a student chapter at SUNY Broome Community College (SUNY Broome) in April of 2024." Dkt. No. 24-16 at ¶¶ 1, 16. "In August of 2025, InterVarsity Broome started meeting, holding a regular Bible study with several SUNY Broome students." *Id.* at ¶ 19. "InterVarsity Broome grew to around a dozen SUNY Broome students." *Id.* "In December 2025, InterVarsity Broome selected [Jacob Sonner] to be its president, [Kate Collwell] as its Vice President, and [Timothy Dreher] as Treasurer." *Id.* at ¶ 24; *see* Dkt. No. 24-27 at ¶ 13.

"On January 11, 2026, consistent with SUNY Broome's Club Handbook procedures and to obtain access to benefits of club recognition, including equal access to campus, [Mr. Sonner] started the process for having InterVarsity Broome receive official recognition as a sponsored student club[,]" Dkt. No. 24-16 at ¶ 25, which "included submitting InterVarsity Broome's constitution[,]" Dkt. No. 24-27 at ¶ 20; *see* Dkt. No. 24-30 at 2. Official recognition of student clubs allows them to, *inter alia*: (1) have access to funds from the Student Government Association; (2) reserve on-campus space; (3) recruit new members; (4) use "The Swarm" (SUNY

Broome's student organization website); and (5) participate in student activities and fairs. *See* Dkt. No. 24-27 at ¶ 20; Dkt. No. 32-1 at ¶¶ 9-11. InterVarsity Broome's proposed constitution states that to be a member of InterVarsity Broome, "[n]o faith background is needed, and we accept anyone and everyone to know the plan Jesus has for them." Dkt. No. 24-28 at 2. The constitution also calls for the formation of an Executive Board, which would "consist, in order of succession, of the President, Vice President, Multi-Campus Coordinator, and Treasurer." *Id.* at 2-3. "All officers shall be elected by a majority vote of the [InterVarsity Broome] membership at the second to last meeting of the semester, at the beginning of each academic year." *Id.* at 4. At issue in this case is the requirement in the constitution that, "[i]n order to be able to be elected, you must also first agree with the Intervarsity statement of faith[.]" *Id.*

In SUNY Broome's 2025-2026 club handbook, section 2.2, entitled "Open Access," requires, in relevant part as follows:

> Clubs may not discriminate against any student for membership or executive board positions in any way. This includes, but is not limited to, discrimination on the basis of race, color, ethnicity, religion, citizenship status, sex, gender, gender identity, gender expression, sexual orientation, veteran status, physical or mental disability or age. Any student that pays the Student Activity fee must be eligible for membership. Any student that pays the Student Activity Fee and has the minimum GPA outline[d] in this handbook must be eligible for an executive board position.

Dkt. No. 32-2 at 7-8.[6] Similarly, SUNY Broome's nondiscrimination policy, Policy No. GA2001, reads in relevant part as follows:

---

[6] The 2026-2027 club handbook has the same provision, *see* Dkt. No. 32-3 at 7-8, as well as a new section 2.2.1 entitled "Open Access Constitutional Requirement," "which provides that recognized clubs must include SUNY Broome's non-discrimination policy 'in [their] club constitutions' and may not limit 'leadership opportunities' on grounds such as 'religion[,]'" Dkt. No. 1 at ¶ 67; *see* Dkt. No. 24-1 at 13 n.1 (citation omitted) ("SUNY Broome recently released its new Club Handbook for the 2026-27 academic year, which substantively tracks the one in effect during InterVarsity Broome's denial"); Dkt. No. 32-1 at 2 n.1 ("The 2026-2027 SUNY Broome

> In all of its activity, the College adheres to its non-discrimination commitment.
>
> SUNY Broome Community College does not discriminate on the basis of race, sex, color, creed, religion (including religious attire, clothing or facial hair), age, national origin, disability, marital status, sexual orientation, gender identity, transgender status, pregnancy, predisposing genetic characteristics, domestic violence victim status, military status or status as a disabled veteran or veteran of the Vietnam era in the recruitment of students; the recruitment and employment of faculty and staff; or the operation of any of its programs and activities.

Dkt. No. 32-4 at 2.

On January 27, 2026, Defendant Kocieniewski entered comments and suggested revisions to Plaintiffs' constitution through The Swarm. *See* Dkt. No. 32-1 at ¶ 15. Regarding the religious leadership requirement, Defendant Kocieniewski commented, "[t]his cannot be included." *Id.*; Dkt. No. 32-7 at 4. "On January 28, Mr. Sonner advised that InterVarsity Broome would meet to 'discuss the changes' [Defendant Kocieniewski] had identified." Dkt. No. 32-1 at ¶ 17; *see* Dkt. No. 32-8 at 5-6. "Thereafter, on February 5, 2026, Mr. Sonner uploaded a revised constitution through The Swarm that removed the requirement that leaders adhere to the statement of faith." Dkt. No. 32-1 at ¶ 17. "The revised constitution was then reviewed by the Student Government Association's Vice President of Student Affairs[,]" and "the Vice President intended to recommend recognition of InterVarsity Broome as a student club, and the General Assembly was scheduled to vote on both the constitution and InterVarsity Broome's application for recognition on February 20, 2026." *Id.* at ¶ 18.

---

Club Handbook substantively retained the same open access approach and added an 'Open Access Constitutional Requirement' directing clubs to include SUNY Broome's nondiscrimination language in their constitutions"). Because the 2025-2026 club handbook was the handbook in effect when InterVarsity Broome was denied official recognition, and because the open access policy is the same in both handbooks, the Court will hereinafter cite exclusively to the 2025-2026 handbook.

However, on February 19, 2026, at 3:41 p.m., Mr. Sonner emailed Defendant Kocieniewski to let him know that InterVarsity Broome "intended to proceed with the original constitution, including particularly the religious leadership component." Dkt. No. 24-27 at ¶ 23; *see* Dkt. No. 32-1 at ¶ 19; Dkt. No. 32-9 at 2. Defendant Kocieniewski "informed [Mr. Sonner] the following morning [(February 20)] that the original constitution would need to be sent to the General Assembly for review before it could be placed on the agenda for a vote, that the process required additional time, and that the recognition vote would not appear on that day's meeting agenda." Dkt. No. 32-1 at ¶ 20; *see* Dkt. No. 24-27 at ¶ 24; Dkt. No. 32-10 at 2. Mr. Sonner "immediately responded to explain that InterVarsity Broome could not remove the religious leadership requirement. [He] also copied Sophia Chan, the local InterVarsity campus minister, so that she could try and help with [Defendant] Kocieniewski's concerns." Dkt. No. 24-27 at ¶ 25; *see* Dkt. No. 32-1 at ¶ 21; Dkt. No. 32-11 at 2. Ms. Chan then emailed Defendant Kocieniewski the same day and "stated that InterVarsity [was] protected by certain federal regulations to be able to include the leadership requirement in its constitution and asked what could be done to proceed with a vote at the next General Assembly meeting, which was scheduled for March 6, 2026." Dkt. No. 32-1 at ¶ 22; *see* Dkt. No. 24-16 at ¶ 29; Dkt. No. 24-27 at ¶ 26; Dkt. No. 32-12 at 2. On February 23, Defendant Kocieniewski emailed Mr. Sonner, copying Ms. Chan, to explain "that inclusion of the Statement of Faith in the constitution was not itself an issue and that InterVarsity's Statement of Faith could be included as an appendix, supporting document, and/or referenced within the mission statement[,]" but made clear that "SUNY Broome could not permit InterVarsity Broome to restrict eligibility for leadership in its constitution based on religious beliefs." Dkt. No. 32-1 at ¶ 23; *see* Dkt. No. 24-16 at ¶ 30; Dkt. No. 24-27 at ¶ 27; Dkt. No. 32-13 at 2.

"On February 24, [Defendant Kocieniewski] posted a denial of InterVarsity Broome's application through The Swarm . . . [which] stated that the originally submitted constitution was in violation of the Club Handbook Open Access policy, Section 2.2, and the SUNY Broome Non-Discrimination Statement, Policy No. GA2001." Dkt. No. 32-1 at ¶ 24; *see* Dkt. No. 24-16 at ¶ 31; Dkt. No. 24-27 at ¶ 28; Dkt. No. 32-14 at 2. On March 23, 2026, InterVarsity President and CEO, Tom Lin, sent Defendant Hawkins a letter asking for SUNY Broome to reconsider its decision. *See* Dkt. No. 24-8 at ¶ 36; Dkt No. 24-14; Dkt. No. 32-1 at ¶ 25. On May 7, 2026, Defendant Hawkins responded by informing InterVarsity "that SUNY Broome would not reconsider its decision." Dkt. No. 24-8 at ¶ 37; *see* Dkt. No. 24-15 at 2.

## III. DISCUSSION

### A. Standard of Review[7]

"'A preliminary injunction is an extraordinary and drastic remedy' and 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (summary order) (quoting *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024)); *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). "Generally, '[a] plaintiff seeking a preliminary injunction must establish [(1)] that he [or she] is likely to succeed on the merits, [(2)] that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of the equities

[7] Defendants contend that Plaintiffs did not "comply with the Court's Individual Rules, which require pre-motion letters and conferences in civil cases and states that '[a]ny motions filed that fail to comply with these rules will be summarily denied by the Court.'" Dkt. No. 32 at 7 n.1 (citation omitted). As Plaintiffs point out, "the pre-motion practice applies to ordinary motions, not motions supported by an order to show cause." Dkt. No. 33 at 15 n.1 (citations omitted); *see* Individual Rules and Practices of Hon. Mae A. D'Agostino, § 2(A)(i), (iii).

tips in his [or her] favor, and [(4)] that an injunction is in the public interest.'" *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) (citation omitted). "However, when the government is the defendant and opposes the preliminary injunction, like it has done so here, the final two requirements merge together." *James*, 160 F.4th at 373 (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020)); *see Nken v. Holder*, 556 U.S. 418, 435 (2009); *Blain v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 22-CV-3022, 2023 WL 366380, *7 (E.D.N.Y. Jan. 24, 2023).

"In some situations, the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff 'show a *clear or substantial* likelihood of success on the merits and make a strong showing of irreparable harm.'" *Daileader v. Certain Underwriters at Lloyds Lond. Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (citing *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). "One situation when this heightened standard applies is when the plaintiff 'seeks a so-called "mandatory injunction,"' . . . rather than a 'prohibitory' one . . . ." *Id.* (internal citations omitted). "At their most basic, the former typically requires the non-movant to take some action, whereas the latter typically requires the non-movant to refrain from taking some action." *Id.* (citing *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018)). The Second Circuit has "explained that '[p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it.'" *Id.* (quoting *N. Am. Soccer League*, 883 F.3d at 36). "In this context, the 'status quo' is really the 'status quo *ante*' – that is, 'the last actual, peaceable[,] uncontested status which preceded the pending controversy.'" *Id.* (quoting *N. Am. Soccer League*, 883 F.3d at 37 & n.5).

Here, Defendants contend that Plaintiffs seek a mandatory injunction, thus requiring Plaintiffs to meet the higher standard, *see* Dkt. No. 32 at 12-13, but Plaintiffs argue that they seek a prohibitory injunction, *see* Dkt. No. 33 at 6-7. The Court agrees with Defendants that Plaintiffs seek a mandatory injunction, as "the last actual, peaceable[,] uncontested status which preceded the pending controversy[,]" *Daileader*, 96 F.4th at 356 (quoting *N. Am. Soccer League*, 883 F.3d at 37), was when "InterVarsity Broome was not a recognized student organization[,]" Dkt. No. 32 at 12; *cf. Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.* (*FCA-SJ*), 82 F.4th 664, 685 (9th Cir. 2023) (en banc) ("[T]he status quo was one in which FCA enjoyed recognition. Because it was the [school] [d]istrict's action that 'affirmatively changed' that status quo and [the] [p]laintiffs' motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction"), *overruled in part on other grounds by Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc).

As Plaintiffs affirmatively seek an order requiring Defendants to recognize InterVarsity Broome, Plaintiffs must meet the higher standard for a mandatory injunction.

**B. Free Speech and Expressive Association Claims**

Plaintiffs contend that they are likely to succeed on their free speech and expressive association claims as Defendants are refusing to recognize InterVarsity Broome as a student group because of its religious leadership requirement. *See* Dkt. No. 24-1 at 24-29; Dkt. No. 33 at 12-13. They also contend that those two claims are analyzed separately. *See id.* Defendants respond that those two analyses merge, and that Plaintiffs are unlikely to succeed on either claim because Defendants' open access policy is viewpoint neutral and reasonable. *See* Dkt. No. 32 at 15-20.

***a. Legal Framework***

The United States Constitution requires that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. "It is established, of course, that the Fourteenth Amendment has made applicable to the States the First Amendment's guarantee of free speech." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547 (1975) (citing *Douglas v. City of Jeannette*, 319 U.S. 157, 162 (1943)). "[F]reedom of association[, which is] protected by the First Amendment, [is also] made applicable to the States through the Fourteenth Amendment." *Elfbrandt v. Russell*, 384 U.S. 11, 18 (1966) (citations omitted).

Defendants argue that the Supreme Court's decision in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010) forecloses Plaintiffs' free speech and expressive association claims. *See* Dkt. No. 32 at 15-20. Plaintiffs disagree. *See* Dkt. No. 24-1 at 26, 29; Dkt. No. 33 at 12-13. In *Martinez*, Hastings College of the Law ("Hastings") required student organizations that sought official recognition as a registered student organization ("RSO") "to comply with Hastings' 'Policies and Regulations Applying to College Activities, Organizations and Students.'" 561 U.S. at 669-70. Included therein was Hastings' nondiscrimination policy, which stated as follows:

> [Hastings] is committed to a policy against legally impermissible, arbitrary or unreasonable discriminatory practices. All groups, including administration, faculty, student governments, [Hastings]-owned student residence facilities and programs sponsored by [Hastings], are governed by this policy of nondiscrimination. [Hastings'] policy on nondiscrimination is to comply fully with applicable law.
>
> [Hastings] shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation. This nondiscrimination policy covers admission, access and treatment in Hastings-sponsored programs and activities.

*Id.* at 670 (internal quotation marks omitted). "Hastings interpret[ed] the Nondiscrimination Policy, as it relate[d] to the RSO program, to mandate acceptance of all comers: School-approved groups must 'allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [his or her] status or beliefs.'" *Id.* at 671. The parties also stipulated that "Hastings require[d] that registered student organizations allow[ed] *any* student to participate, become a member, or seek leadership positions in the organization, regardless of [his or her] status or beliefs." *Id.* at 675.

"From Hastings' adoption of its Nondiscrimination Policy in 1990 until the events stirring [*Martinez*], 'no student organization at Hastings . . . ever sought an exemption from the Policy.'" *Id.* at 671-72. However, in 2004, Christian Legal Society ("CLS") "became the first student group to do so." *Id.* at 672. "CLS chapters [were required to] adopt bylaws that, *inter alia*, require[d] members and officers to sign a 'Statement of Faith' and to conduct their lives in accord with prescribed principles." *Id.* "Among those tenets [was] the belief that sexual activity should not occur outside of marriage between a man and a woman; CLS thus interpret[ed] its bylaws to exclude from affiliation anyone who engage[d] in 'unrepentant homosexual conduct.'" *Id.* "CLS also exclude[d] students who h[e]ld religious convictions different from those in the Statement of Faith." *Id.* CLS applied for RSO status, which Hastings rejected because "CLS's bylaws . . . did not comply with the Nondiscrimination Policy because CLS barred students based on religion and sexual orientation." *Id.* at 672-73. CLS requested an exemption from the nondiscrimination policy, which Hastings declined. *See id.* at 673. CLS sued Hastings and "alleged that Hastings' refusal to grant the organization RSO status violated CLS's First and Fourteenth Amendment rights to free speech, expressive association, and free exercise of religion." *Id.*

Pertaining to cases that delineate between the rights of free speech and expressive association, the Supreme Court explained that "CLS would have [the Supreme Court] engage each line of cases independently, but its expressive-association and free-speech arguments merge: *Who* speaks on its behalf, CLS reasons, colors *what* concept is conveyed." *Id.* at 680. "It therefore ma[d]e[] little sense to treat CLS's speech and association claims as discrete." *Id.* (citing *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 300 (1981)). The Supreme Court was "persuaded that [its] limited-public-forum precedents adequately respect[ed] both CLS's speech and expressive-association rights, and fairly balance[d] those rights against Hastings' interests as property owner and educational institution." *Id.* at 683. Therefore, Hastings' complained-of policy would survive scrutiny if it was reasonable and viewpoint neutral. *See id.* at 679 (citations omitted).

The Supreme Court "first consider[ed] whether Hastings' policy [was] reasonable taking into account the RSO forum's function and 'all the surrounding circumstances.'" *Id.* at 685 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985)). The Court then reviewed the justifications provided by Hastings in defense of its all-comers requirement. *See id.* at 687-90. "First, the open-access policy 'ensure[d] that the leadership, educational, and social opportunities afforded by [RSOs] [were] available to all students.'" *Id.* at 687-88. "Second, the all-comers requirement help[ed] Hastings police the written terms of its Nondiscrimination Policy without inquiring into an RSO's motivation for membership restrictions." *Id.* at 688. "Third, [Hastings] reasonably adhere[d] to the view that an all-comers policy, to the extent it [brought] together individuals with diverse backgrounds and beliefs, 'encourage[d] tolerance, cooperation, and learning among students.'" *Id.* at 689. "Fourth, Hastings' policy, which incorporate[d]—in fact, subsume[d]—state-law proscriptions on

discrimination, convey[ed] [Hastings'] decision 'to decline to subsidize with public monies and benefits conduct of which the people of California disapprove[d].'" *Id.* at 689-90. The Supreme Court held that "the several justifications Hastings assert[ed] in support of its all-comers requirement [were] surely reasonable in light of the RSO forum's purposes." *Id.* at 690. The Supreme Court explained:

> Students tend to self-sort and presumably will not endeavor en masse to join—let alone seek leadership positions in—groups pursuing missions wholly at odds with their personal beliefs. And if a rogue student intent on sabotaging an organization's objectives nevertheless attempted a takeover, the members of that group would not likely elect [him or] her as an officer.

*Id.* at 692-93.

Next, the Supreme Court "consider[ed] whether Hastings' all-comers policy [was] viewpoint neutral." *Id.* at 694. The Supreme Court emphasized that "[i]t is, after all, hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* The Supreme Court explained, "Hastings' all-comers requirement draws no distinction between groups based on their message or perspective. An all-comers condition on access to RSO status, in short, is textbook viewpoint neutral." *Id.* at 694-95. In responding to the argument that the all-comers policy heavily burdened groups with unpopular viewpoints, the Supreme Court explained that "argument stumble[d] from its first step because '[a] regulation that serve[d] purposes unrelated to the content of expression is deemed neutral, even if it ha[d] an incidental effect on some speakers or messages but not others.'" *Id.* at 695 (first quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); then citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994)). The Supreme Court ultimately held, "[f]inding Hastings' open-access

condition on RSO status reasonable and viewpoint neutral, [the Supreme Court] reject[ed] CLS's free-speech and expressive-association claims." *Id.* at 697.

As a threshold matter, applying the reasoning from *Martinez*, the Court agrees with Defendants that Plaintiffs' free speech and expressive association claims merge for purposes of the Court's analysis. *See id.* at 680; *Intervarsity Christian Fellowship/USA v. Univ. of Iowa* (*InterVarsity-Iowa II*), 5 F.4th 855, 863 (8th Cir. 2021) (citation omitted); *Bus. Leaders In Christ v. Univ. of Iowa* (*BLinC II*), 991 F.3d 969, 980 (8th Cir. 2021) (citation omitted); *Univ. at Buffalo Young Ams. for Freedom v. Univ. at Buffalo Student Ass'n Inc.*, No. 25-CV-140, 2025 WL 3075633, *3 (2d Cir. Nov. 3, 2025) (summary order) (citation omitted).[8] Thus, Plaintiffs' free speech and expressive association claims will not be substantially likely to succeed if the open access and nondiscrimination policies are reasonable and viewpoint neutral. *See Martinez*, 561 U.S. at 679 (citations omitted).

***i. Reasonableness***

Regarding the reasonableness of the open access and nondiscrimination policies, "[i]n a limited public forum, the reasonableness analysis turns on the particular purpose and characteristics of the forum and the extent to which the restrictions on speech are reasonably related to maintaining the environment the government intended to create in that forum.'" *Univ. at Buffalo Young Ams. for Freedom*, 2025 WL 3075633, at *4 (quoting *Tyler v. City of Kingston*, 74 F.4th 57, 63 (2d Cir. 2023)). Plaintiffs contend that the policies are "unreasonable because

---

[8] "Summary orders, though not precedential, are typically 'highly persuasive and predictive of how the Second Circuit Court of Appeals would decide an issue in the future.'" *Megginson v. City of New York*, 821 F. Supp. 3d 291, 305 (E.D.N.Y. 2026) (quoting *Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-CV-3406, 2015 WL 10793422, *4 (S.D.N.Y. Aug. 14, 2015), *aff'd*, 672 Fed. Appx. 85 (2d Cir. 2016) (summary order)); *see Diggs v. Guynup*, 621 F. Supp. 3d 315, 324 n.4 (N.D.N.Y. 2022) (citation omitted).

[they] undermine[] SUNY Broome's purpose for opening the student group forum." Dkt. No. 24-1 at 26. Plaintiffs take the position that "SUNY Broome's forum exists to foster private student groups that give students room for 'personal exploration' and 'leadership,' and to 'help students feel at home in an environment that may otherwise feel foreign or intimidating . . . [and] forbidding religious groups from having religious leaders undermines the forum's purposes." *Id.* However, "a [s]tate's restriction on access to a limited public forum 'need not be the most reasonable or the only reasonable limitation.'" *Martinez*, 561 U.S. at 692 (quoting *Cornelius*, 473 U.S. at 808).

Plaintiffs take the same position that the Supreme Court rejected in *Martinez*. *See* Dkt. No. 24-1 at 26. There, CLS argued that "[t]here can be no diversity of viewpoints in a forum . . . if groups [were] not permitted to form around viewpoints." *Martinez*, 561 U.S. at 692. "CLS also assail[ed] the reasonableness of the all-comers policy in light of the RSO forum's function by forecasting that the policy [would] facilitate hostile takeovers; if organizations must open their arms to all, CLS contend[ed], saboteurs [would] infiltrate groups to subvert their mission and message." *Id.* The Supreme Court rejected those arguments, *see id.* at 692-93, as does this Court.

Here, SUNY Broome's open access and nondiscrimination policies closely track the policy in *Martinez*. *Compare* Dkt. No. 32-2 at 7-8, *and* Dkt. No. 32-4 at 2, *with Martinez*, 561 U.S. at 670-71. Indeed, just as Hastings' policy "mandate[d] acceptance of all comers[,]'" *Martinez*, 561 U.S. at 671, SUNY Broome's open access policy mandates that "[c]lubs may not discriminate against any student for membership or executive board positions *in any way*[,]" Dkt. No. 32-2 at 7 (emphasis added), and notes that the class characteristics that cannot be discriminated against are not exhaustive, *see id.* ("This includes, but is not limited to . . ."). As a result, the Court agrees with Defendants that the policies appear to be reasonable because they were "put into place to foster inclusivity amongst student organizations . . . ." Dkt. No. 32 at 20; *see Martinez*, 561 U.S.

at 687-88 ("[T]he open-access policy 'ensures that the leadership, educational, and social opportunities afforded by [RSOs] are available to all students'").

***ii. Viewpoint Neutrality***

Turning to whether the open access and nondiscrimination policies are viewpoint neutral, "[v]iewpoint-based restrictions target 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" *Univ. at Buffalo Young Ams. for Freedom*, 2025 WL 3075633, at *3 (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 281 (2d Cir. 1997)); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995). SUNY Broome's policies, *see* Dkt. No. 32-2 at 7-8; Dkt. No. 32-4 at 2, fall within the definition of an all-comers policy, like the policy in *Martinez*, *see BLinC II*, 991 F.3d at 973 n.3 ("An all-comers policy 'mandate[s] acceptance of all comers'") (quoting *Martinez*, 561 U.S. at 671). As such, SUNY Broome's policies are facially neutral. *See Martinez*, 561 U.S. at 694 ("It is . . . hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers").

Plaintiffs rely on *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996) in support of their position. *See* Dkt. No. 24-1 at 25-26; Dkt. No. 33 at 12-13. In *Hsu*, the Second Circuit interpreted the Equal Access Act and held "that the [Bible] club's Christian officer requirement, as applied to some of the club's officers, [was] essential to the expressive content of the meetings and to the group's preservation of its purpose and identity, and [was] therefore protected by the Equal Access Act." 85 F.3d at 848. The Second Circuit's self-described "narrow" holding was as follows:

> [W]hen a sectarian religious club discriminates on the basis of religion for the purpose of assuring the sectarian religious character of its meetings, a school must allow it to do so unless that club's

> specific form of discrimination would be invidious (and would thereby violate the equal protection rights of other students), or would otherwise disrupt or impair the school's educational mission.

*Id.* at 872-73.

Defendants attempt to distinguish *Hsu* because it "involved the interpretation of the federal Equal Access Act, not a constitutional challenge under the First Amendment." Dkt. No. 32 at 19 n.4. On this point, the Court instead agrees with Plaintiffs that the Second Circuit "treated the act as an 'analog' to the First Amendment, using free-speech precedent as 'interpretative tools.'" Dkt. No. 33 at 12 (quoting *Hsu*, 85 F.3d at 856-57). Defendants also note that *Hsu* predates *Martinez* by more than a decade; therefore, *Martinez* controls. *See* Dkt. No. 32 at 19 n.4. Plaintiffs respond that "*Hsu*'s core holding—that religious leadership is 'essential to the expressive content of [a religious group's] meetings' because the group's speech depends on 'the religious commitment of [its] officers,' . . . has been fundamentally reaffirmed since[.]" Dkt. No. 33 at 12-13 (citations omitted). *Hsu* rested its holding, as Plaintiffs note, on First Amendment precedent. However, *Hsu* did not conduct the limited public forum analysis which the Supreme Court in *Martinez* held governs these types of free speech and expressive association claims. Instead, the Second Circuit in *Hsu* explained that it was guided by cases "analyzed under the [Supreme] Court's *freedom of association* jurisprudence." 85 F.3d at 858 (emphasis added). The Supreme Court expressly declined to analyze these types of cases under that framework. *See Martinez*, 561 U.S. at 681 (citations omitted) ("[T]he strict scrutiny we have applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums—the State may 'reserv[e] [them] for certain groups'"). In *Martinez*, the Supreme Court explained that the "expressive-association and free-speech

arguments merge[d,]" and applied its "limited-public-forum precedents . . . for assessing both [the] speech and association rights." *Id.* at 680.

As a result of this tension between *Martinez* and *Hsu*, *Hsu*'s continued viability has been questioned. *See* Charles J. Russo, *Religious Freedom in the United States: "When You Come to A Fork in the Road, Take It"*, 38 U. DAYTON L. REV. 363, 395 n.209 (2013) ("In a 1996 case of dubious precedential value in the wake of [*Martinez*], the Second Circuit acknowledged that under the Equal Access Act, the students retained the right to select leaders who complied with the Christian club's religious standards and left the door open to the possibility that those who disagreed with the group's beliefs were free to form their own club") (citing *Hsu*, 85 F.3d at 862); William E. Thro & Charles J. Russo, *A Serious Setback for Freedom: The Implications of Christian Legal Society v. Martinez*, 261 EDUC. L. REP. 473, 484 n.95 (2010) ("As one aspect of the impact that [*Martinez*] may have on religious groups, it is worth keeping in mind a case from the Second Circuit that this judgment essentially repudiates"). The Second Circuit has "cautioned District Courts against preemptively declaring that [its] caselaw has been abrogated by intervening Supreme Court decisions." *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024). However, "[i]n rare cases, a district court can decline to follow [Second Circuit] precedent if it concludes that an intervening Supreme Court decision has so clearly undermined [Second Circuit] precedent that it will almost inevitably be overruled." *Id.* at 54 n.36 (citation omitted). Given the factual similarities between this case and *Martinez*, the fact that *Martinez* is newer, and the lack of Second Circuit precedent rejecting *Martinez*, the Court will follow the Supreme Court's guidance from *Martinez*. Indeed, the Second Circuit just last year explained that the analysis in *Martinez* "controls here." *Univ. at Buffalo Young Ams. for Freedom*, 2025 WL 3075633, at *4.

Thus, because the open access policy and nondiscrimination policy appear to be reasonable and facially neutral, Plaintiffs have not established a substantial likelihood of success on their free speech and expressive association claims. *See Martinez*, 561 U.S. at 697.

**C. Free Exercise Claim**

Plaintiffs contend that they are likely to succeed on their free exercise claim because Defendants are denying them benefits based on their religious exercise, and Defendants' actions fail strict scrutiny. *See* Dkt. No. 24-1 at 20-24; Dkt. No. 33 at 10-12. Defendants respond that Plaintiffs' free exercise claim is unlikely to succeed because the open access policy and nondiscrimination policy are neutral and generally applicable, and they satisfy rational basis review. *See* Dkt. No. 32 at 20-26.

The United States Constitution requires that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. CONST. amend. I. "This guarantee is incorporated against the states via the Fourteenth Amendment." *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 330 (2d Cir. 2025) (per curiam) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), "the Supreme Court reaffirmed that a law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review." *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.* (*We The Patriots*), 76 F.4th 130, 144 (2d Cir. 2023) (citing *Smith*, 494 U.S. at 879); *see Mahmoud*, 606 U.S. at 564 (citation omitted) ("[T]he government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable"). "If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is

narrowly tailored to advance a compelling government interest." *We The Patriots*, 76 F.4th at 144 (citing *Tandon v. Newsom*, 593 U.S. 61, 62-63 (2021) (per curiam); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)); *see Mahmoud*, 606 U.S. at 564 ("First, a court must ask if the burdensome policy is neutral and generally applicable. Second, if the first question can be answered in the negative, a court will proceed to ask whether the policy can survive strict scrutiny").

***a. Neutrality***

"A law is not neutral under *Smith* if the government 'proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.'" *We The Patriots*, 76 F.4th at 145 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). "A law may fail the neutrality prong either facially, that is, 'if it explicitly singles out a religious practice,' or on account of improper legislative intent, that is, 'if it targets religious conduct for distinctive treatment.'" *Id.* (quoting *We The Patriots USA, Inc. v. Hochul* (*Hochul*), 17 F.4th 266, 281 (2d Cir. 2021) (per curiam), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (per curiam)); *see Lukumi*, 508 U.S. at 534. "To fail the neutrality prong, it is not enough for a law to simply affect religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." *We The Patriots*, 76 F.4th at 145 (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 634 (2018)). The Supreme Court has been clear that "'subtle departures from neutrality' violate the Free Exercise Clause, and thus 'upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures.'" *Id.* (quoting *Masterpiece Cakeshop*, 584 U.S. at 638-39). "To determine whether the government has acted neutrally, courts look to factors such as the background of the challenged decision, the sequence of events

leading to its enactment, and the legislative or administrative history." *Id.* (citing *Masterpiece Cakeshop*, 584 U.S. at 638-39).

The policies at issue here, *see* Dkt. No. 32-2 at 7-8; Dkt. No. 32-4 at 2, appear neutral. The Court agrees with Defendants that "[t]he Policies do not single out religious groups, draw distinctions based on religion, or otherwise subject religious organizations to distinctive treatment. Nor do Plaintiffs contend that any historical background, events, or statements leading to the adoption of the . . . [p]olic[ies] show hostility to religion." Dkt. No. 32 at 22 (citing *Slattery v. Hochul*, 61 F.4th 278, 292 (2d Cir. 2023)); *see Youth 71Five Ministries v. Williams* (*Youth 71Five Ministries II*), 160 F.4th 964, 979-80 (9th Cir. 2025) (finding the nondiscrimination rule was neutral), *petition for cert. filed*, No. 25-776 (Dec. 23, 2025).

***b. General Applicability***

"A law is generally applicable when it treats similar conduct similarly, without regard to whether the conduct is religiously motivated." *We The Patriots*, 76 F.4th at 145. In laying out when a law is generally applicable, the Second Circuit stated as follows:

> The Supreme Court has explained that a law is *not* generally applicable in at least two circumstances: first, where it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," and second, where it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."

*Id.* (quoting *Fulton*, 593 U.S. at 533-34). The Second Circuit has "described this second inquiry in terms of whether a law is 'substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it.'" *Id.* (quoting *Hochul*, 17 F.4th at 284-85).

The Court agrees with Defendants that Plaintiffs have failed to demonstrate that the policies are not generally applicable. *See* Dkt. No. 32 at 22-23. As Defendant Kocieniewski explains in his affidavit, "[n]o new student club has been recognized by SUNY Broome that has restricted membership or executive leadership qualifications based on any protected discriminatory characteristic (i.e., religion, gender, race, etc.) in [his] time at SUNY Broome." Dkt. No. 32-1 at ¶ 27. Furthermore, "SUNY Broome does not have an exemption policy or procedure through which student organizations are permitted to avoid the Open Access policy or Non-Discrimination policy by limiting their membership or executive leadership based on religious views, race, se[x], or any other protected characteristics." *Id.* at ¶ 28. While "SUNY Broome has recognized student clubs whose missions center around religion or other protected characteristics[,]" *id.* at ¶ 29, those clubs have maintained open membership and leadership eligibility, *see id.* at ¶¶ 29-31. As a result, the Court finds that the open access and nondiscrimination policies are likely generally applicable. *See Youth 71Five Ministries II*, 160 F.4th at 980-82 (holding that the nondiscrimination policy was generally applicable where it did not provide individualized exemptions and treated comparable religious and secular activity the same).

Several of the cases cited by Plaintiffs and Defendants support the Court's conclusion, because those cases involved the uneven application of the policies, unlike here. In *FCA-SJ*, the en banc Ninth Circuit found that the "[p]laintiffs ha[d] shown a likelihood of success on the merits of their Free Exercise claims to support the issuance of a preliminary injunction." 82 F.4th at 694. In that case, the Ninth Circuit explained that "rather than apply its non-discrimination policies *without exception*, the [school] [d]istrict admit[ted] that it retain[ed] (and exercise[d]) significant discretion in applying exceptions to its own programs, as well as to student programs."

*Id.* at 687. The Ninth Circuit held that "[t]he [school] [d]istrict's broad discretion to grant exemptions on less than clear considerations remove[d] its non-discrimination policies from the realm of general applicability and thus subject[ed] the policy to strict scrutiny." *Id.* at 688. The Ninth Circuit continued, stating that "it [was] evident that in addition to a lack of general applicability, there [were] significant concerns with the [school] [d]istrict's lack of neutrality." *Id.* The Ninth Circuit further held that "the [school] [d]istrict's acceptance of comparable selective secular organizations render[ed] its decision to revoke and refuse recognition to FCA subject to strict scrutiny." *Id.* at 689-90.

Similarly, in *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73 (D.D.C. 2024), the court held that "FCA [was] . . . likely to succeed on the merits of its Free Exercise Clause claim." *Id.* at 93. However, in that case, the court explained that "FCA ha[d] supplied sufficient evidence to conclude that the District [of Columbia] did not apply its Anti-Discrimination Policy in a generally applicable manner. As such, strict scrutiny [was] triggered[.]" *Id.* (citation omitted).

In *InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University* (*Wayne State*), 534 F. Supp. 3d 785 (E.D. Mich. 2021), the court granted summary judgment to the plaintiffs on their free exercise claim. *See id.* at 829. However, there, the court explained that the "[d]efendants' actions to bar [the] [p]laintiffs from being able to set leadership requirements for their religious leaders and hold [registered student organization] status, and *intentionally creating carveouts for secular groups* who also restrict[ed] leadership, was not viewpoint neutral . . . ." *Id.* (emphasis added). As a result, the court held that the "[d]efendants[']

decision to revoke [the] [p]laintiffs' [registered student organization] status similarly infringed on [the] [p]laintiffs' free exercise rights." *Id.*

Similarly, in *InterVarsity Christian Fellowship/USA v. University of Iowa* (*InterVarsity-Iowa I*), 408 F. Supp. 3d 960 (S.D. Iowa 2019), *aff'd*, 5 F.4th 855 (8th Cir. 2021), the court granted summary judgment to the plaintiffs on their free exercise claim. *See id.* at 985. The court explained that in "granting the exceptions it ha[d] to the Human Rights Policy and refusing to make a similar exception for InterVarsity, the University ha[d] made a value judgment that its secular reasons for deviating from the Human Rights Policy [were] more important than InterVarsity's religious reasons for the deviation it [sought]." *Id.* at 983. As a result, the court held that "the University's decision to deregister InterVarsity [was] subject to strict scrutiny." *Id.*; *see also id.* at 980 ("The [registered student organizations] Policy, on its face, exempt[ed] fraternities and sororities from the Human Rights Policy so they [could] speak about gender. Categorically, sports clubs [could] speak about gender. Various other groups [could] express views on gender . . . veteran status . . . and creed . . . by either limiting or encouraging membership and leadership based on those characteristics. Some groups, such as Love Works, Zeta Beta Tau, and Pi Kappa Phi, [could] express their views on religion").

The common thread that binds those cases together is that those schools did not apply their policies evenly. Plaintiffs have not presented any evidence to show that the open access and nondiscrimination policies provide for individualized exceptions, or that SUNY Broome treats comparable religious and secular activity differently. The evidence presently before the Court demonstrates the opposite.

Plaintiffs rely heavily on *Carson ex rel. O. C. v. Makin*, 596 U.S. 767 (2022), *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), to argue that any time a religious organization is denied otherwise available public benefits because of their religious exercise, strict scrutiny applies. *See* Dkt. No. 24-1 at 20-22; Dkt. No. 33 at 10-12.[9]

In *Trinity Lutheran*, the Supreme Court explained the controversy as follows:

> The Missouri Department of Natural Resources offer[ed] state grants to help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires. Trinity Lutheran Church applied for such a grant for its preschool and daycare center and would have received one, but for the fact that Trinity Lutheran [was] a church. The Department had a policy of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program.

582 U.S. at 453-54. The Supreme Court laid out the relevant test, stating that "[t]he Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Id.* at 458 (quoting *Lukumi*, 508 U.S. at 533, 542). "Applying that basic principle, [the Supreme] Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Id.* (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)). With that background, the Supreme Court explained that "the State's

[9] The Supreme Court will decide this term: (1) "Whether proving a lack of general applicability under *Employment Division v. Smith* requires showing unfettered discretion or categorical exemptions for identical secular conduct"; and (2) "Whether *Carson v. Makin* displaces the rule of *Employment Division v. Smith* only when the government explicitly excludes religious people and institutions." Petition for a Writ of Certiorari at i-ii, *St. Mary Cath. Par. v. Roy* (No. 25-581), 2025 WL 3221412, *i-ii; *see St. Mary Cath. Par. v. Roy*, 608 U.S. —, 146 S. Ct. 2573 (2026) (granting certiorari as to questions one and two in the petition).

decision to exclude [Trinity Lutheran] for purposes of [the] public program [had to] withstand the strictest scrutiny." *Id.* at 463. The Supreme Court held that "the exclusion of Trinity Lutheran from a public benefit for which it [was] otherwise qualified, solely because it [was] a church, [was] odious to our Constitution all the same, and [could not] stand." *Id.* at 467.

Next, in *Espinoza*, the factual background was similar and as follows:

> The Montana Legislature established a program to provide tuition assistance to parents who sen[t] their children to private schools. The program grant[ed] a tax credit to anyone who donate[d] to certain organizations that in turn award[ed] scholarships to selected students attending such schools. When petitioners sought to use the scholarships at a religious school, the Montana Supreme Court struck down the program. The Court relied on the "no-aid" provision of the State Constitution, which prohibit[ed] any aid to a school controlled by a "church, sect, or denomination."

591 U.S. at 467-68. The Supreme Court explained "that strict scrutiny applie[d] under *Trinity Lutheran* because Montana's no-aid provision discriminate[d] based on religious status." *Id.* at 479. The Supreme Court laid out that "[a] State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 487. Ultimately, the Supreme Court held that the exclusion of the religious schools "from the scholarship program . . . [was] 'odious to our Constitution' and '[could not] stand.'" *Id.* at 489 (quoting *Trinity Lutheran*, 582 U.S. at 467).

Finally, in *Carson*, Maine had a tuition assistance program, and "[m]ost private schools [were] eligible to receive the payments, so long as they [were] 'nonsectarian.'" 596 U.S. at 771-73. The Supreme Court explained that a law that "disqualif[ies] some private schools from funding solely because they are religious . . . must be subjected to the strictest scrutiny." *Id.* at 780 (internal quotation marks omitted) (quoting *Espinoza*, 591 U.S. at 478, 487). The Supreme Court held that "Maine's 'nonsectarian' requirement for its otherwise generally available tuition

assistance payments violate[d] the Free Exercise Clause of the First Amendment. Regardless of how the benefit and restriction [were] described, the program operate[d] to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 789.

This trilogy of cases does not change the Court's conclusion here. The argument that Plaintiffs advance is not new and has been rejected multiple times. In *Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir. 2024), the Fourth Circuit explained, "[t]hese cases stand only for the point that religious schools cannot be excluded from grant programs solely because of their religious character." *Id.* at 748. Similarly, in *St. Mary Catholic Parish in Littleton v. Roy*, 154 F.4th 752 (10th Cir. 2025), *cert. granted sub nom.*, *St. Mary Catholic Parish v. Roy*, 608 U.S. —, 146 S. Ct. 2573 (2026), the Tenth Circuit held that "the *Carson* line of cases addressed laws that targeted 'religious status' and 'religious use' on the explicit basis that they were religious and not secular." *Id.* at 764 (citations omitted).

Further, in *St. Dominic Academy v. Makin*, 181 F.4th 11 (1st Cir. 2026), there was a "Religious Nondiscrimination Rule" which "bar[red] schools from discriminating on the basis of religion in 'academic, extracurricular, research, occupational training or other program[s] or activit[ies],' 'athletic programs,' 'admission[s],' 'recruitment,' or 'financial assistance.'" *Id.* at 25 (quoting ME. STAT. tit. 5, § 4602(1)). The First Circuit did "not find that *Carson* render[ed] the Religious Nondiscrimination Rule per se not neutral. To find otherwise would, in essence, be to hold that any state practice imposing any burden on a religious school's religious practices necessarily imposes a burden solely because the school is religious -- and therefore triggers strict scrutiny." *Id.* at 42. The First Circuit explained that "[s]uch a ruling would, in all but theory, eliminate the allowance for neutral, generally applicable laws that incidentally burden religious

practice recognized by *Smith* . . . and applied in the cases that underpin *Carson* itself." *Id.* (citing *Trinity Lutheran*, 582 U.S. at 460; *Lukumi*, 508 U.S. at 546).

At bottom, *Carson*, *Espinoza*, and *Trinity Lutheran* prohibit states from withholding otherwise available public benefits to religious organizations solely because of their religious exercise. Such a withholding expressly discriminates against religious organizations, thus triggering strict scrutiny. *See Trinity Lutheran*, 582 U.S. at 461-62. This concept is "unremarkable in light of [the Supreme Court's] prior decisions." *Id.* at 462. The open access and nondiscrimination policies here do none of the following: (1) condition official recognition on clubs being "nonsectarian[,]" *Carson*, 596 U.S. at 773; (2) prohibit official recognition to any club "controlled by a 'church, sect, or denomination[,]'" *Espinoza*, 591 U.S. at 468; or (3) "categorically disqualify[] churches and other religious organizations from" being officially recognized, *Trinity Lutheran*, 582 U.S. at 454. In fact, several religious clubs *are* officially recognized by SUNY Broome. "For example, the Brothers and Sisters in Christ ("BASIC") are a recognized student organization that describes itself as a 'non-denominational Christian group that's all about building friendships, growing in faith, and creating a community together.'" Dkt. No. 32-1 at ¶ 29 (citation omitted). Similarly, "SUNY Broome's Muslim Student Association (M.S.A.) has a stated purpose of fostering 'a communal environment for Muslim students at SUNY Broome and for them to be able to connect with each other' and 'to encourage Muslims and Non-Muslims with the fundamental understanding of humanity, equality, and service to others.'" *Id.* at ¶ 30. The difference between these groups and InterVarsity Broome is that those groups have no restrictions on who can be elected to leadership positions. *See id.* at ¶¶ 29-30; Dkt. Nos. 32-15, 32-16.

Because the open access and nondiscrimination policies are neutral and generally applicable, the Court holds that rational basis review is the appropriate standard to analyze Plaintiffs' free exercise claim.

***c. Rational Basis Review***

"Rational basis review requires [SUNY Broome] to have chosen a means for addressing a legitimate goal that is rationally related to achieving that goal." *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (per curiam) (citing *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct. of N.Y.*, 852 F.3d 178, 191 (2d Cir. 2017)); *see Miller v. McDonald*, 180 F.4th 420, 427 (2d Cir. 2026) (per curiam) (citation omitted) (describing rational basis review as a "relatively low hurdle"), *petition for cert. filed*, No. 26-438 (Sept. 28, 2026); *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 587 U.S. 490, 491 (2019) (per curiam) ("To survive under that standard, a state law need only be 'rationally related to legitimate government interests'") (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)).

SUNY Broome has a "legitimate interest" in having a "commitment to equitable access, equal opportunity, and inclusion." *Youth 71Five Ministries II*, 160 F.4th at 982 (citations omitted); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 625-26 (1984) (citation omitted) (concluding there is a "state interest in assuring equal access" and "[a]ssuring women equal access . . . clearly furthers compelling state interests"); *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 91 (1st Cir. 2004) (stating that it was a legitimate state interest "to foster 'excellence, equity and diversity through access and educational opportunity throughout the Boston Public Schools'"); *Every Nation Campus Ministries at S.D. State Univ. v. Achtenberg*, 597 F. Supp. 2d 1075, 1098 (S.D. Cal. 2009) ("Defendants had a rational basis for drafting and implementing their nondiscrimination policy"). The open access and nondiscrimination policies rationally further

that interest by ensuring that clubs are equally open to all students regardless of race, sex, religion, or any other protected characteristic. *See Youth 71Five Ministries II*, 160 F.4th at 982 ("The Rule rationally furthers that interest by ensuring that Division-funded initiatives are equally open to employees, volunteers, and participants regardless of race, sex, religion, or any other protected characteristic"). As a result, the open access and nondiscrimination policies satisfy rational basis review.

This conclusion is bolstered by the Supreme Court's decision in *Martinez*. There, the Supreme Court explained that "CLS briefly argue[d] that Hastings' all-comers condition violate[d] the Free Exercise Clause." *Martinez*, 561 U.S. at 697 n.27. The Supreme Court held that its "decision in *Smith* . . . foreclose[d] that argument. In *Smith*, the [Supreme] Court held that the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Id.* (citation omitted). The Supreme Court continued, "[i]n seeking an exemption from Hastings' across-the-board all-comers policy, CLS, [the Supreme Court] repeat[ed], [sought] preferential, not equal, treatment; it therefore [could not] moor its request for accommodation to the Free Exercise Clause." *Id.* Plaintiffs argue that "[t]he three sentences of analysis in that footnote is displaced and outweighed by" *Carson*, *Espinoza*, and *Trinity Lutheran*. Dkt. No. 24-1 at 22. However, for the reasons previously stated, that trilogy of cases was a straightforward application of *Smith* and its progeny. *Martinez* held that an all-comers policy does not violate the Free Exercise Clause, which controls here.

Therefore, Plaintiffs have not established a substantial likelihood of success on their free exercise claim.

**D. Church Autonomy Claims**

Plaintiffs contend that they are likely to succeed on their church autonomy and ministerial exception claims because SUNY Broome's exclusion of InterVarsity Broome violates the church autonomy doctrine in two ways: (1) it has interfered with the ministerial exception; and (2) by prohibiting the religious leadership requirement, SUNY Broome has intruded into matters of faith, doctrine, and governance. *See* Dkt. No. 24-1 at 15-19; Dkt. No. 33 at 7-10. Defendants respond that Plaintiffs are unlikely to succeed on these claims because the church autonomy doctrine and ministerial exception are not "freestanding cause[s] of action that may be invoked to invalidate neutral and generally applicable policies." Dkt. No. 32 at 27.

***a. Legal Framework***

The law relevant to this claim begins with *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171 (2012). There, the plaintiff, Cheryl Perich ("Perich"), was employed by Hosanna-Tabor Evangelical Lutheran Church ("Hosanna-Tabor") "to teach in a capacity regarded by the church as that of a minister, [and] was dismissed from her employment after developing an illness and taking a period of disability leave." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 750 F.3d 184, 202 (2d Cir. 2014) (citing *Hosanna-Tabor*, 565 U.S. at 178-79). "The plaintiff sued for reinstatement, alleging that her dismissal violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.* (1990)." *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 179-80).

The Supreme Court, in analyzing the Establishment Clause and Free Exercise Clause, held that "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor*, 565 U.S. at 181. The Supreme Court explained that "[b]y forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English

Crown—would have no role in filling ecclesiastical offices." *Id.* at 184. "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.* In discussing its prior decisions in the context of disputes over church property, the Supreme Court wrote that its "decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185; *see Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952); *Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696 (1976).

The Supreme Court acknowledged that "the Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 565 U.S. at 188 & n.2 (collecting cases). The Supreme Court "agree[d] that there [was] such a ministerial exception." *Id.* at 188. "The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." *Id.* "Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* "By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* "According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89. The Supreme

Court wrote that it could not "accept the remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers." *Id.* at 189.

While, as explained, the Supreme Court's *Smith* decision usually requires neutral and generally applicable laws to be upheld in free exercise claims, the Supreme Court wrote that "*Smith* involved government regulation of only outward physical acts. [*Hosanna-Tabor*], in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at 190 (citation omitted). "The contention that *Smith* forecloses recognition of a ministerial exception rooted in the Religion Clauses has no merit." *Id.*

The Supreme Court agreed "that the ministerial exception is not limited to the head of a religious congregation[.]" *Id.* The Supreme Court was "reluctant, however, to adopt a rigid formula for deciding when an employee qualifie[d] as a minister. It [was] enough for [the Supreme Court] to conclude . . . that the exception cover[ed] Perich, given all the circumstances of her employment." *Id.* Given "the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church . . . [the Supreme Court] conclude[d] that Perich was a minister covered by the ministerial exception." *Id.* at 192.

Although a title of commissioned minister, "by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee's position." *Id.* at 193. The Supreme Court explained that "lay teachers at the school performed the same religious duties as Perich[,]" and while that was "relevant, it [could not] be dispositive that others not formally recognized as ministers by the church perform[ed] the same functions—particularly when, as here, they did so only because

commissioned ministers were unavailable." *Id.* "It [was] true that [Perich's] religious duties consumed only [forty-five] minutes of each workday, and that the rest of her day was devoted to teaching secular subjects. The EEOC regard[ed] that as conclusive, contending that any ministerial exception 'should be limited to those employees who perform exclusively religious functions.'" *Id.* The Supreme Court could not "accept that view. Indeed, [the Supreme Court] [was] unsure whether any such employees exist[ed]." *Id.* The Supreme Court stated that "[t]he heads of congregations themselves often have a mix of duties, including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities." *Id.* Rather, "[t]he amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations discussed above." *Id.* at 194.

The Supreme Court held that "[b]ecause Perich was a minister within the meaning of the exception, the First Amendment require[d] dismissal of [the] employment discrimination suit against her religious employer." *Id.* It explained that "[t]he EEOC and Perich originally sought an order reinstating Perich to her former position as a called teacher. By requiring the Church to accept a minister it did not want, such an order would have plainly violated the Church's freedom under the Religion Clauses to select its own ministers." *Id.* While "Perich no longer [sought] reinstatement," she "continue[d] to seek frontpay in lieu of reinstatement, backpay, compensatory and punitive damages, and attorney's fees." *Id.* The Supreme Court noted that "[a]n award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." *Id.* "Such relief would depend on a determination that Hosanna-Tabor was wrong to have

relieved Perich of her position, and it is precisely such a ruling that is barred by the ministerial exception." *Id.*

The Supreme Court stated, "[t]he purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason." *Id.* "The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical,' . . . —is the church's alone." *Id.* at 194-95 (internal citation omitted). The Supreme Court noted that "[a] conflict ha[d] arisen in the Courts of Appeals over whether the ministerial exception [was] a jurisdictional bar or a defense on the merits." *Id.* at 195 n.4 (collecting cases). It "conclude[d] that the exception operate[d] as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Id.* The Supreme Court "h[e]ld only that the ministerial exception bar[red] such a suit. [The Supreme Court] express[ed] no view on whether the exception bar[red] other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." *Id.* at 196. While societal interests in enforcing employment discrimination statutes were important, the Supreme Court explained "so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* The Supreme Court concluded, "[w]hen a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way." *Id.*

Eight years later, the Supreme Court decided *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020). "That case involved two former Catholic school primary teachers who brought a variety of employment discrimination claims against their former employers." *Pulsifer v. Westshore Christian Acad.*, 142 F.4th 859, 865 (6th Cir. 2025) (citing *Our Lady of*

*Guad.*, 591 U.S. at 738-45). "The teachers did not carry any formal ministerial title, and the majority of the subjects they taught were secular." *Id.* (citing *Our Lady of Guad.*, 591 U.S. at 738-45). "But each performed important religious functions to further the schools' mission, including teaching religion classes, praying with students, participating in religious services, molding their students' religious development, and otherwise integrating religious values into their daily activities." *Id.* (citing *Our Lady of Guad.*, 591 U.S. at 738-45).

In laying out the legal background, the Supreme Court explained that "[a]mong other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters '"of faith and doctrine"' without government intrusion." *Our Lady of Guad.*, 591 U.S. at 746 (quoting *Hosanna-Tabor*, 565 U.S. at 186). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Id.* "The independence of religious institutions in matters of faith and doctrine is closely linked to independence in what [the Supreme Court] [has] termed matters of church government." *Id.* (internal quotation marks omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 186). The Supreme Court stated that "[t]his does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* "And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*

"The 'ministerial exception' was based on this insight. Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* Without the power "to select, supervise, and if

necessary, remove a minister without interference by secular authorities[,]" "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith. The ministerial exception was recognized to preserve a church's independent authority in such matters." *Id.* at 747 (footnote omitted).

The Supreme Court emphasized that "[i]n determining whether a particular position falls within the *Hosanna-Tabor* exception, a variety of factors may be important." *Id.* at 751. The Supreme Court explained that the circumstances in *Hosanna-Tabor*, "while instructive in *Hosanna-Tabor*, are not inflexible requirements and may have far less significance in some cases." *Id.* at 753. "What matters, at bottom, is what an employee does." *Id.* The Supreme Court instructed that "[i]n a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Id.* at 757. "A religious institution's explanation of the role of such employees in the life of the religion in question is important." *Id.* The Supreme Court made clear that instead of imposing a "rigid formula[,]" it "called on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception." *Id.* at 757-58 (citation omitted). The Supreme Court ultimately held that "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762.

***b. Application***

The parties dispute whether Plaintiffs' church autonomy and ministerial exception claims can be utilized as standalone claims, and whether the ministerial exception applies outside of

employment related actions. *Compare* Dkt. No. 32 at 27-28, *with* Dkt. No. 33 at 7-9. Defendants contend that the ministerial exception only applies in labor and employment discrimination cases, and that the church autonomy doctrine and the ministerial exception may only be asserted as affirmative defenses. *See* Dkt. No. 32 at 27-28. Plaintiffs argue that the ministerial exception applies outside of the employment context, and that the church autonomy doctrine and ministerial exception may be asserted as standalone claims. *See* Dkt. No. 33 at 7-9. There are cases that support each side's position.

First, it warrants differentiating between the church autonomy doctrine and the ministerial exception. "The church autonomy doctrine, also referred to as the ecclesiastical abstention doctrine, ensures that religious associations have independence in matters of faith and doctrine and in closely linked matters of internal government." *Belya v. Kapral* (*Belya II*), 188 F.4th 169, 177 (2d Cir. 2026) (internal quotation marks omitted) (quoting *Belya v. Kapral* (*Belya I*), 45 F.4th 621, 630 (2d Cir. 2022)); *see Our Lady of Guad.*, 591 U.S. at 747. "The ministerial exception, however, is one component of church autonomy." *Belya I*, 45 F.4th at 628 n.4 (citing *Our Lady of Guad.*, 591 U.S. at 746). "The purpose of the ministerial exception is to ensure[ ] that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical, . . . —is the church's alone." *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 423 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 194-95).

In their opposition, Defendants rely upon *Jusino v. Federation of Catholic Teachers, Inc.*, 54 F.4th 95 (2d Cir. 2022). *See* Dkt. No. 32 at 27. There, the Second Circuit wrote, "[t]he ministerial exception 'precludes application of [labor and employment-discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers.'" *Jusino*, 54 F.4th at 104 n.2 (quoting *Hosanna-Tabor*, 565 U.S. at 188). Plaintiffs cite

to several cases to argue that the ministerial exception applies outside of the employment context. *See* Dkt. No. 33 at 8-9 (citations omitted).

First, Plaintiffs cite *Wayne State*, where one judge from District Court of the Eastern District of Michigan held that the ministerial exception extends beyond just the employment context. *See* 534 F. Supp. 3d at 805-06 & n.4. Plaintiffs next cite a quote from *Our Lady of Guadalupe*, where the Supreme Court wrote that "[t]he three prior decisions on which [it] primarily relied drew on this broad principle, and none was exclusively concerned with the selection or supervision of clergy." 591 U.S. at 747. However, Plaintiffs take that quote out of context. In *Our Lady of Guadalupe*, the Supreme Court was explaining that "[t]he constitutional foundation for [its] holding [in *Hosanna-Tabor*] was the general principle of church autonomy to which [the Supreme Court] [had] already referred: independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* There, the Supreme Court was explaining that the ministerial exception stemmed from the church autonomy doctrine, and that the *church autonomy doctrine* "was [not] exclusively concerned with the selection or supervision of clergy." *Id.* However, Defendants claim only that the *ministerial exception* applies solely to employment claims. *See* Dkt. No. 32 at 27.

Plaintiffs also cite *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202 (10th Cir. 2025). There, the Tenth Circuit "h[e]ld that the church autonomy doctrine bar[red] [the] [p]laintiffs' first RICO theory, because it improperly require[d] adjudication of ecclesiastical questions, namely, the truth or falsity of religious beliefs." *Id.* at 1207-08. Again, that is the church autonomy doctrine, not the ministerial exception. Plaintiffs further cite *Tassinari v. Salvation Army*, No. 21-CV-10806, 2026 WL 1948096 (D. Mass. July 6, 2026). Once again, that case involved the church autonomy doctrine, not the ministerial

exception. *See id.* at *5-9; *see also id.* at *6 n.12 ("True enough, this is not a ministerial-exception case"). Finally, Plaintiffs cite *McRaney v. North American Mission Board of the Southern Baptist Convention, Inc.*, 157 F.4th 627 (5th Cir. 2025). There, the Fifth Circuit explained that the ministerial exception "extends just as strongly to ministries structured through voluntary associations and at-will partnerships. The opposite rule would irrationally exclude from the First Amendment's protections religious groups that 'for theological reasons have few to no paid clergy,' such as the Church of Jesus Christ of Latter-day Saints and Jehovah's Witnesses." *Id.* at 652. However, whether the plaintiff suing is paid, or unpaid through a voluntary association or at-will partnership, the suit is still an employment suit in nature. *See id.* ("These cases confirm what the Supreme Court has already told us: We 'are bound to stay out of employment disputes' involving ministers and ecclesiastical organizations") (quoting *Our Lady of Guad.*, 591 U.S. at 746).

In sum, Plaintiffs have pointed to no case from the Supreme Court, Second Circuit, or even a district court within the Second Circuit where the ministerial exception applied outside of the employment context.

Addressing Defendants' second argument, they cite *Hosanna-Tabor*, where the Supreme Court "conclude[d] that the [ministerial] exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." 565 U.S. at 195 n.4. Similarly, they cite *Belya II*, where the Second Circuit concluded that "the church autonomy doctrine operates as an affirmative defense[.]" 188 F.4th at 175 n.5 (citing *Belya I*, 45 F.4th at 633). There are cases that recognize the church autonomy doctrine and ministerial exception as only affirmative defenses. *See Youth 71Five Ministries II*, 160 F.4th at 982-84; *InterVarsity-Iowa I*, 408 F. Supp. 3d at 985-88; *Bus. Leaders in Christ v. Univ. of Iowa* (*BLinC I*), 360 F. Supp. 3d 885, 903-05 (S.D. Iowa

2019), *aff'd in part, rev'd in part and remanded*, 991 F.3d 969 (8th Cir. 2021). But there are two district courts that have found that a plaintiff can assert the ministerial exception as a standalone claim. *See Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184 (D. Colo. 2023); *Wayne State*, 534 F. Supp. 3d at 802-07.[10]

In *Youth 71Five Ministries II*, the Ninth Circuit analyzed the district court's decision that the plaintiff's church autonomy claims were unlikely to succeed on the merits because the church autonomy doctrine was an affirmative defense. *See Youth 71Five Ministries v. Williams* (*Youth 71Five Ministries I*), No. 1:24-CV-399, 2024 WL 3183923, *5 (D. Or. June 26, 2024). The Ninth Circuit explained that it was "aware of no court of appeals that treats the religious-autonomy doctrines as the basis for standalone claims challenging legislative or executive action, rather than as defenses against or limits upon plaintiffs' invocation of *judicial* authority." *Youth 71Five Ministries II*, 160 F.4th at 983 (citations omitted). The Ninth Circuit noted that 71Five Ministries "ha[d] identified no opinion from the Supreme Court, [Ninth Circuit], or another court of appeals suggesting that plaintiffs may assert ecclesiastical abstention or the ministerial exception as § 1983 claims, nor any 'historical practices [or] understandings' that would justify [its] recognition of these novel claims under the Religion Clauses." *Id.* at 983-84 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022)). "Without more, [the Ninth Circuit] [could not] say that the district court abused its discretion in concluding that 71Five'[s] religious-autonomy claims [were] unlikely to succeed." *Id.* at 984.

In *BLinC I*, the court noted that "the ministerial exception has traditionally been used as a defense to claims asserted against a religious organization, not as its own cause of action." 360 F.

[10] The First Circuit recently did not take a position and noted that "it is not clear the ministerial exception as it currently stands can even be used as the basis of a claim, rather than as a defense." *St. Dominic Acad.*, 181 F.4th at 52 n.43 (citations omitted).

Supp. 3d at 904 (citations omitted). "BLinC [did] not cite any cases that appl[ied] the ministerial exception in the manner it [sought] [t]here. Given the Supreme Court's efforts in *Hosanna-Tabor* to constrain the reach of its holding, the Court decline[d] to extend it to the University's actions in [that] matter." *Id.* at 905.

In *InterVarsity-Iowa I*, the court held that "the 'ministerial exception,' as it ha[d] been recognized by federal courts, [did] not apply to [that] dispute. The ministerial exception is an affirmative defense, 'grounded in the First Amendment, that precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its members.'" 408 F. Supp. 3d at 986 (quoting *Hosanna-Tabor*, 565 U.S. at 188). The court wrote that the "[p]laintiffs' reliance on the ministerial exception [was] misguided. The Supreme Court recognized in *Hosanna-Tabor* that the ministerial exception represents a marriage of interests protected by the Establishment and Free Exercise Clauses." *Id.* at 987 (citing *Hosanna-Tabor*, 565 U.S. at 188-89). "But [the] [p]laintiffs' Religion Clauses claims [were] really a single claim under the Free Exercise Clause[.]" *Id.* That was because "the University ha[d] not 'appointed ministers' for InterVarsity in violation of the Establishment Clause; rather, it ha[d] 'interfer[ed] with the freedom of [InterVarsity] to select [its] own [leaders]' in violation of the Free Exercise Clause." *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 184). "The record [did] not indicate the University [could] actually select InterVarsity's leaders or install them over the group's objections. At worst, the University, through threats of deregistration or other penalties, could 'impos[e] an unwanted [leader]' on InterVarsity, thereby 'infring[ing] the Free Exercise Clause.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 188).

On the other side of the coin, in *Darren Patterson*, one judge from the District Court of Colorado held that the "[p]laintiff [was] likely to succeed on its claims arising from the First

Amendment religion clauses." 699 F. Supp. 3d at 1184. That was because the "non-discrimination policy likely violate[d] [the] [p]laintiff's rights by interfering with the school's selection of key employees in accordance with its religious convictions under the 'ministerial exception.'" *Id.* (citation omitted). The court further held that "[r]equiring the school to hire its teachers or other ministers without discriminating on the basis of religion, therefore, would likely violate [the] [p]laintiff's free exercise of religion, as protected by the ministerial exception." *Id.*

Similarly, in *Wayne State*, the court held that *Hosanna-Tabor* and *Our Lady of Guadalupe* could not "be fairly read to first recognize a religious organization's absolute right to appoint its ministers while at the same time prohibiting the organization any means by which it may seek to terminate, redress, or remedy even the most blatant of government restrictions and incursions into such ministerial business." *Wayne State*, 534 F. Supp. 3d at 803. "That is, other than in the one, narrow form of presenting an affirmative defense in the event it were to face an employment lawsuit implicating its internal ministerial affairs." *Id.* In explaining Section 1983, the court wrote that "Congress passed § 1983 in the post-civil war era to allow individuals to vindicate their constitutional rights in the face of abusive, and often repressive, state governments." *Id.* at 804 (citations omitted). "To bring a § 1983 claim, there is no requirement that individuals first risk civil or criminal liability at a court proceeding." *Id.* at 805. "Section 1983 explicitly gives private parties the right to sue officials for the 'deprivation of *any* rights, privileges, or immunities secured by the Constitution.'" *Id.* (quoting 42 U.S.C. § 1983). "The court [was] aware of no exception in § 1983 for basic First Amendment liberties, and [the] [d]efendants [did] not present arguments to the contrary." *Id.* "It strain[ed] credulity to think that the First Amendment was enacted solely to protect religious organizations' internal management from the judiciary and private lawsuits. The First Amendment and § 1983 were not designed to lay dormant until

targeted individuals and groups face[d] a criminal or civil judgment." *Id.* The "[d]efendants fail[ed] to explain why federal courts would feel the need to erect such substantial barriers to private anti-discrimination suits, which largely seek money damages, but would allow a state government to directly influence a religious organization's internal management without the organization's ability to sue under § 1983." *Id.* at 806. The court ultimately held that "[a] religious group can vindicate its right to internal management through use of § 1983, and the right [was] not siloed to use as an affirmative defense[,]" and that "[t]he First Amendment provides religious organizations the right to select their own ministers, and, under the First Amendment and § 1983, organizations can sue the government for violating that right." *Id.* at 806, 807.

It is true that the Supreme Court has "repeatedly held that the coverage of [Section 1983] must be broadly construed." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) (citations omitted); *see Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (footnote omitted) ("A broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of '*any* rights, privileges, or immunities secured by the Constitution and laws'"). However, Plaintiffs have pointed to no Supreme Court or circuit court case where the church autonomy doctrine or ministerial exception were permitted to proceed as independent claims under Section 1983. *See Youth 71Five Ministries II*, 160 F.4th at 983-84 (citations omitted). The Supreme Court cases that Plaintiffs cite are inapposite.

Plaintiffs first cite *Kedroff*. "In *Kedroff* . . . the [Supreme] Court struck down as unconstitutional a statute changing who in the church would control a cathedral." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655-56 (10th Cir. 2002) (citation omitted). However, that case did not apply Section 1983 to assert standalone church autonomy claims, and it involved a dispute between churches in Russia and North America. *See Kedroff*,

344 U.S. at 95-96; *see also Couzens v. City of Forest Park*, 114 F.4th 571, 579 (6th Cir. 2024) ("There, two sides sought to acquire control over a Russian Orthodox Cathedral: an archbishop appointed by the Patriarch in Moscow and a New York corporation on behalf of an archbishop chosen by American churches") (citing *Kedroff*, 344 U.S. at 95-96). That case did not involve a dispute between a religious group and a government entity and is therefore distinguishable. Plaintiffs also cite *Milivojevich*. However, just like *Kedroff*, that was "a case involving a dispute over control of the American–Canadian Diocese of the Serbian Orthodox Church, including its property and assets." *Hosanna-Tabor*, 565 U.S. at 187. Following the Serbian Orthodox Church's removal of Dionisije Milivojevich as bishop of the American–Canadian Diocese, "Dionisije brought a civil action in state court challenging the Church's decision, and the Illinois Supreme Court 'purported in effect to reinstate Dionisije as Diocesan Bishop,' on the ground that the proceedings resulting in his removal failed to comply with church laws and regulations." *Id.* (quoting *Milivojevich*, 426 U.S. at 708). Thus, like *Kedroff*, *Milivojevich* did not involve a dispute between a religious group and a government entity and is therefore distinguishable as well.

The circuit court cases that Plaintiffs cite are also readily distinguishable. Plaintiff first cites *Northside Bible Church v. Goodson*, 387 F.2d 534 (5th Cir. 1967). *Goodson*, like *Kedroff* and *Milivojevich*, was a dispute between a group of religious people and entities; specifically, the Presiding Bishop of the Alabama-West Florida Conference of The Methodist Church, the District Superintendent of the Mobile District of that Conference, and the Board of Trustees of the Alabama-West Florida Conference against, *inter alios*, the Northside Bible Church. *See id.* at 536. Plaintiffs also cite *Dixon v. Edwards*, 290 F.3d 699 (4th Cir. 2002). Following the same pattern, that case involved a dispute between, *inter alios*, the Bishop *Pro Tempore* of the Diocese

of Washington and "an ordained Priest of the Church who claim[ed] entitlement to the office of Rector of St. John's Parish in Accokeek, Maryland, a parish within the Diocese of Washington . . . ." *Id.* at 703.

The Supreme Court and Second Circuit have specifically referred to the church autonomy doctrine and ministerial exception as affirmative defenses, *see Hosanna-Tabor*, 565 U.S. at 195 n.4; *Belya II*, 188 F.4th at 175 n.5 (citation omitted), and the Ninth Circuit has held that they do not amount to standalone claims under Section 1983, *see Youth 71Five Ministries II*, 160 F.4th at 982-84. Because Plaintiffs have not presented any binding authority to the contrary, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on their church autonomy and ministerial exception claims.

**E. Remaining Preliminary Injunction Factors**

Because Plaintiffs have failed to establish a substantial likelihood of success on their claims, "the Court need not reach the Plaintiff[]s['] arguments with respect to the balance of equities or irreparable harm." *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 333-34 (E.D.N.Y. 2014) (collecting cases); *see Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) (citations omitted) ("Because the District Court did not err in concluding that the CSPU could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the CSPU demonstrated irreparable harm or whether an injunction would be in the public interest"); *see also Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("Because a likelihood of success has not been shown here, however, we need not decide whether a presumption of irreparable harm would otherwise apply. Whether presumed or not, any irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a

likelihood of success"); *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 510 (S.D.N.Y. 2021) ("Plaintiff has not shown a likelihood of success on the merits, and the Court need not address the other elements"); *Benitez v. King*, 298 F. Supp. 3d 530, 539 (W.D.N.Y. 2018) (citation omitted) ("Having made this determination, the Court need not address the other necessary elements for the issuance of a preliminary injunction"); *Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 365 n.21 (E.D.N.Y. 2014) ("Since plaintiff has not demonstrated a likelihood of success on the merits of any of its claims against defendants, it is unnecessary to consider the 'irreparable injury' and 'public interest' prongs of a preliminary injunction motion").

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 9, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge